# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-DP-00177-SCT

*JAMES COBB HUTTO, III a/k/a JAMES C.
HUTTO, III a/k/a JAMES COBB HUTTO a/k/a
JAMES C. HUTTO a/k/a JAMES HUTTO, III a/k/a
JAMES HUTTO a/k/a JAMIE HUTTO a/k/a THE
HITMAN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/28/2013 |
| TRIAL JUDGE: | HON. WILLIAM A. GOWAN, JR. |
| TRIAL COURT ATTORNEYS: | LORA HUNTER |
| | WILLIAM LABARRE |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: ANDRE DeGRUY |
| | JOHN HELMERT |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LADONNA C. HOLLAND |
| | JASON L. DAVIS |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL- DEATH PENALTY- DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 05/11/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1. A jury convicted James Cobb Hutto III of capital murder for the death of Ethel W. Simpson. The jury also found Hutto should suffer death. Hutto raises fourteen assignments of error on appeal. Finding no reversible error, we affirm Hutto's conviction and sentence.

## STATEMENT OF FACTS AND PROCEDURE

¶2.    This case concerns the killing of eighty-one-year-old Ethel W. Simpson. The following facts were established at trial.

¶3.    On September 8, 2010, James Cobb Hutto III, a Jasper, Alabama, resident, contacted his ex-girlfriend, Sherri Lawson. Hutto told Lawson he wanted to see her and, on Friday, September 10, he purchased a used Camaro and drove to Clinton, Mississippi. Hutto and Lawson stayed together that weekend at the Comfort Inn in Clinton. At some point that weekend, Hutto's Camaro broke down and was towed to a local repair shop.

¶4.    On Monday, September 13, Hutto and Lawson parted ways after spending the weekend together. According to Lawson, Hutto indicated that he was trying to get back to Alabama. He also gave Lawson the paperwork to repair the broken Camaro in case she wanted to keep the car for herself. Later that afternoon, Hutto went to the Baptist Healthplex on the Mississippi College Campus in Clinton, located approximately half a mile away from the Comfort Inn. Several employees and patrons of the Healthplex encountered Hutto that day, including Ethel W. Simpson.

¶5.    While at the Healthplex, Hutto befriended Simpson. Simpson drove Hutto back to the Comfort Inn and then drove home. And later that night, she went back to the hotel and picked up Hutto to socialize. The two took Simpson's silver Mercedes to the Riverwalk casino in Vicksburg, Mississippi, arriving at 8:45 p.m. Hutto and Simpson spent a few hours gambling,

2

and Simpson bought dinner for the two at a restaurant inside the casino. Hutto and Simpson left the casino together at 11:24 p.m.

¶6. About an hour after leaving the casino, Hutto arrived back at the Comfort Inn alone with Simpson's Mercedes. He went to his room, emerged wearing different clothes, and left the Comfort Inn at approximately 12:51 a.m., seven minutes after arriving back at the hotel. Hutto then drove Simpson's Mercedes back to Vicksburg, where he gambled at the Ameristar casino. At 2:11 a.m., he left the casino, and, according to witness testimony, a tag-reading camera on Interstate 20 in Rankin County captured an image of Simpson's car traveling east toward Alabama just after 3:00 a.m.

¶7. On the morning of September 14, 2010, Thomas Winstead, Simpson's brother and roommate, alerted Simpson's son that Simpson had not returned home the night before. Ken Simpson attempted to inquire into his mother's whereabouts, and when she could not be found, he contacted the Clinton Police Department. During the investigation into Simpson's whereabouts, law-enforcement officials determined that Hutto was the last person seen with Simpson. On September 17, 2010, a member of the Auburn (Alabama) Police Department spotted Hutto driving Simpson's silver Mercedes. Law-enforcement officials stopped Hutto and took him into custody in Lee County, Alabama.

¶8. On the same day as Hutto's arrest, Simpson's body was found on a hog farm in Edwards, Mississippi, just off Interstate 20. Edwards is located in Hinds County and is approximately halfway between Clinton and Vicksburg. An empty hog-feed container

3

partially covered Simpson's body. Simpson died from severe injuries to her head and neck, and forensic testing later identified her blood on the Nike flip-flops that Hutto wore on the night of Simpson's disappearance.

¶9. After Hutto's arrest, law-enforcement officials from Alabama interviewed him on four separate occasions. All four of these interrogations occurred in Alabama. Hutto told law-enforcement officials that he and Simpson had gone to the casino on the night of September 13, but he claimed that a man named Mark Cox had killed Simpson. Law-enforcement officials later determined that Mark Cox, an Alabama resident, was in Alabama at the time of Simpson's disappearance.

**Procedure**

¶10. On March 1, 2011, a Hinds County grand jury indicted Hutto for capital murder while engaged in the commission of a robbery. Hutto was appointed counsel and, in May 2011, he entered a plea of "not guilty." The trial judge held numerous pretrial hearings, including a suppression hearing and a competency hearing. After the competency hearing, the trial judge determined Hutto to be competent to stand trial. Hutto also rejected a plea deal for life in prison without the possibility of parole, and the State sought the death penalty.

¶11. During the guilt phase of trial, the State called numerous witnesses, including Mark Cox. Cox testified that, prior to the trial, he had never been to Hinds County, Mississippi. Cox further testified that he met Hutto for the first time on the morning of September 17, 2010–the same day law-enforcement officials arrested Hutto–when the two discussed Cox

4

selling Hutto some land. The State also introduced redacted portions of all four interrogations law-enforcement officials conducted with Hutto in Alabama.[1] At the guilt phase, Hutto presented no defense and exhibited crude behavior in the courtroom. The jury convicted him of capital murder, with robbery of the Mercedes as the underlying crime.

¶12.    At the penalty phase, the State submitted three aggravating circumstances to the jury: the "prior violent felony" aggravator, the "heinous, atrocious, or cruel" aggravator, and the "capital offense committed in the commission of a robbery" aggravator. In mitigation, the jury heard testimony from Hutto's ex-wife, mother, and two sons, as well as testimony from a social worker. The jury found Hutto should suffer death. Hutto appeals, raising fourteen assignments of error, which we have restated and re-ordered for clarity.

## DISCUSSION

¶13.    "This Court reviews an appeal from a capital-murder conviction and death sentence under heightened scrutiny." ***Ronk v. State***, 172 So. 3d 1112, 1125 (Miss. 2015).

### *Pretrial and Guilt Stage*

I.    **Whether the trial court erred when it determined Hutto was competent to stand trial and whether the trial court erred in not ordering further mental evaluation mid-trial.**

    A.    **Pretrial Competency**

---

[1]The videos were redacted because Hutto also faces other criminal charges in the State of Alabama. Any statements or questions concerning the Alabama charges or any other crimes were withheld from the jury in the case at hand.

¶14. After a competency hearing, the trial judge determined Hutto to be competent to stand trial. On appeal, Hutto argues: (1) that the trial judge erred when he placed the burden on him to prove his incompetence; (2) that the overwhelming weight of the evidence showed he was incompetent to stand trial; and (3) that the trial judge committed reversible error by failing to make specific findings of fact for each factor to determine a defendant's competence.

> **1. Whether the trial judge erred when he placed the burden on Hutto to prove he was incompetent to stand trial.**

¶15. Hutto argues that this Court's decision in *McGinnis v. State*, 133 So. 2d 399 (Miss. 1961), required the prosecution to prove Hutto was competent to stand trial. He claims that *McGinnis* stands for the proposition that, once an order requiring a mental evaluation is entered, "the burden shifts to the State to prove that a defendant is competent." We disagree.

¶16. Simply put, our decision in *McGinnis* does not stand for the proposition that the prosecution bears the burden of proving a defendant's competence after an order requiring a mental examination is entered. To the contrary, we consistently have placed the burden on the defendant to show his incompetence. *See, e.g., Ross v. State*, 954 So. 2d 968, 1007 (Miss. 2007) ("The defendant must show incompetency by a preponderance of the evidence."); *Evans v. State*, 725 So. 2d 613, 660 (Miss. 1997) ("The trial judge committed no error in holding that the burden of proof was allocated to the defense. This issue is without merit."); *Emmanuel v. State*, 412 So. 2d 1187, 1188 (Miss. 1982) ("It naturally devolves upon the

defendant to go forward with the evidence to show his probable incapacity to make a rational defense.").

¶17. Hutto also asserts that this Court has misinterpreted *Medina v. California*, 505 U.S. 437, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992), because Mississippi does not have a statute allocating the burden of proving an individual's competence as California did in *Medina*. But, though Mississippi does not have such a statute, the U.S. Supreme Court has held:

> Once a State provides a defendant access to procedures for making a competency evaluation, however, we perceive no basis for holding that due process further requires the State to assume the burden of vindicating the defendant's constitutional right by persuading the trier of fact that the defendant is competent to stand trial.

*Medina v. California*, 505 U.S. 437, 449, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992). We find it immaterial that the Legislature has not spoken on this issue and see no reason to depart from our well-established precedent. This argument is without merit.

### 2. Whether the overwhelming weight of the evidence showed Hutto was incompetent before trial.

¶18. Prior to trial, Hutto's counsel filed a motion to determine Hutto's competence. The trial judge then promptly entered an order for Hutto to undergo a mental evaluation. Due to a delay at the state hospital, a significant amount of time passed before Hutto underwent a mental evaluation. During this time frame, Hutto logged profanities and exhibited other crude behavior in court on numerous occasions. The trial judge determined that Hutto's outbursts generally concerned the circumstances of his confinement.

7

¶19.    Due to the delay at the State Hospital, Hutto's counsel hired a private psychologist, Dr. Goff, to evaluate Hutto. Dr. Goff, however, could not complete "the psychological testing portion" of the examination because Hutto would not cooperate. Finally, on February 14, 2013, Dr. Robert Storer conducted Hutto's mental evaluation at the State Hospital.[2] Hutto initially stated that he would not cooperate with Storer, but he later agreed to complete the "Personality Assessment Inventory." Storer's report notes that Hutto completed the assessment in "an usually short period of time" and the report produced "an invalid profile due to elevations on the validity scales." [3]

¶20.    Because of the invalid test scores and Hutto's refusal to answer questions, Storer could not give an expert opinion to a reasonable degree of psychological and psychiatric certainty that Hutto "does not have deficits in his competence-related abilities." But Storer did note that

---

[2]In preparation for the assessment, Dr. Robert Storer reviewed numerous incarceration, medical, education, and court records, and he conducted phone interviews with persons who knew Hutto.

[3]The Negative Impression Management ("NIM") scale indicated that Hutto "attempted to portray himself in an especially negative manner." The report notes that Hutto's "NIM scale [was] even higher that [sic] the average NIM score of subjects instructed to malinger in research studies." Further, "Hutto's score on the Malingering Index . . . indicate[d] it is likely that he was purposefully exaggerating and/or fabricating difficulties in his responses." Lastly, Hutto's score on the Positive Impression Management scale indicated "that he was not attempting to present himself in a positive light." As a result of his elevated scores, his test results had to be considered invalid.

. . . . collateral interviews and available records provide no evidence of cognitive deficits, memory problems, or irrational thought processes. Medical requests and grievance forms . . . demonstrate no deficits in his ability to communicate clearly and effectively or in his ability to think logically. Mr. Hutto also demonstrated the ability to reconsider and reverse a prior decision . . . During our evaluation of him on 14 February 2013, while Mr. Hutto was observed over the course of several hours and while he was completing psychological testing, he demonstrated no deficits in his ability to interact with staff. He also demonstrated no deficits in his awareness of his situation, his thought process, or his ability to understand a wide range of pertinent issues . . . . As for whether Mr. Hutto suffers from mental disease or defect, there appears to be good evidence . . . that he does not . . . . Likewise, although there appears to be good evidence . . . that he has the functional abilities associated with competence, because Mr. Hutto refused to answer our questions, I am not able to say with a reasonable degree of psychological and psychiatric certainty that Hutto does not have deficits in his competence-related abilities.

¶21. After the mental evaluation, the State extended to Hutto a plea offer of life without the possibility of parole. Hutto's counsel signed the plea petition, affirming they were satisfied that Hutto understood the contents of the petition. At the plea colloquy, however, Hutto rejected the plea deal after learning that he would waive his appeal rights by entering a guilty plea.

¶22. On April 22, 2013, the trial court held a competency hearing. Defense counsel called no witnesses and rested on Storer's report. Based on his observations of Hutto, Storer's report, and the plea colloquy, the trial judge found Hutto competent to stand trial. A written order subsequently was entered. Hutto claims that the overwhelming weight of the evidence showed him to be incompetent to stand trial and that the trial judge erred in relying on a report created by Dr. Robert Storer. We disagree.

9

¶23.   A trial judge's determination that a defendant is competent to stand trial will be reversed only if it is "manifestly against the overwhelming weight of the evidence." *Dickerson v. State*, 175 So. 3d 8, 15 (Miss. 2015) (citing *Hearn v. State*, 3 So. 3d 722, 728 (Miss. 2008)). It is well-settled that the standard to determine whether a defendant is competent to stand trial is if "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . and whether he has a rational as well as factual understanding of the proceedings against him." *Id*. (quoting *Dusky v. United States*, 362 U.S. 402, 402, 80 S. Ct. 788, 788-89, 4 L. Ed. 2d 824, 825 (1960)). A competent defendant is one

> (1) who is able to perceive and understand the nature of the proceedings; (2) who is able to rationally communicate with his attorney about the case; (3) who is able to recall relevant facts; (4) who is able to testify in his own defense if appropriate; and (5) whose ability to satisfy the foregoing criteria is commensurate with the severity of the case.

*Id*. (citing *Hearn*, 3 So. 3d at 728).

¶24.   We find the trial judge did not manifestly err in finding Hutto competent to stand trial. The record indicates that the trial judge held numerous pretrial hearings at which he could observe Hutto personally during the delay at the State Hospital. Hutto's outbursts at these hearings, though disruptive, do not suggest to this Court that Hutto was incompetent. Instead, the record supports the trial judge's conclusion that Hutto's outbursts generally concerned the conditions of the detention center, including showers and recreational time.

¶25. Hutto fails to point to instances in the record showing that he *lacked the ability to consult with his attorneys* or *lacked an understanding* of the proceedings against him. *See Dusky*, 362 U.S. at 402. Though the record shows instances in which Hutto failed to cooperate with counsel, our review of the record does not suggest that Hutto lacked the *ability* to do so. Further, the record supports the trial judge's conclusion that Hutto understood the proceedings. The trial judge's competency order shows that Hutto chose not to enter a guilty plea when he learned he would be waiving his appeal rights. Even more, Hutto's counsel indicated, by signing the plea petition, that they believed Hutto was competent to enter a guilty plea.

¶26. Lastly, the trial judge did not err by relying on Dr. Storer's report to find Hutto competent. As previously mentioned, Storer could not form an opinion to a reasonable degree of psychological certainty regarding Hutto's competence because Hutto failed to cooperate. But, though Hutto alleges that the trial court erred by relying on Storer's "non-finding," Hutto's counsel did not call and cross-examine Storer or any other medical professional at the competency hearing to discredit his observations. Simply put, we find Hutto presented *no evidence* to the trial judge suggesting he was incompetent to stand trial. Thus, we cannot conclude that the overwhelming weight of the evidence shows that the trial judge manifestly erred by finding Hutto competent to stand trial. This argument fails.

    **3.    Whether our decision in *Conner* requires a trial judge to make specific findings of fact for each competence consideration.**

¶27. Hutto next argues that the trial judge erred by not making specific findings of fact for the five competence considerations listed in *Conner v. State*, 632 So. 2d 1239 (Miss. 1993), *overruled on other grounds by Weatherspoon v. State*, 732 So. 2d 158 (Miss. 1999). Hutto argues the trial judge did not consider the first or fifth criterion nor cite any legal standard in his order and therefore committed reversible error. We disagree.

¶28. In *Conner*, this Court considered whether a trial judge had erred by not ordering a competency hearing. *Id*. at 1247. In doing so, we took note of "a set of five criteria which, according the American Bar Association, collectively define a competent defendant." *Id*. at 1248. This Court then considered Conner's argument that he did "not meet factors two through five." *Id*. at 1249. Ultimately, we found "[t]he trial judge did not manifestly err in not ordering a competency hearing."[4] *Id.*

¶29. A review of *Conner* shows that we did not hold that a trial judge must make specific findings of fact based on the five competence criteria. Further, although the trial judge did not cite the applicable test for determining a defendant's competence in his order, the trial judge did determine that Hutto understood the nature of the proceedings and was able to assist his counsel rationally. This issue is without merit.

B. **Mid-trial Competence**

---

[4]We note that *Conner* "relied upon former Uniform Circuit Court Rule 4.08, which did not require that a competency hearing be conducted following a court-ordered mental examination. Instead, a competency hearing was required only if there remained 'reasonable grounds' to believe that the defendant was insane." *Hearn*, 3 So. 3d at n.11 (Miss. 2008).

12

¶30. Hutto argues alternatively that the trial judge erred by not ordering Hutto to undergo further mental evaluation after another outburst during trial. Hutto's cousin, Jason Wilson, testified for the State on the third day of trial. After the direct examination of Wilson, Hutto had another outburst:

> BY THE DEFENDANT: Don't give a f--- about none of them, especially them - - them or them - - I don't care. F--- all of y'all. See that? F--- y'all.
>
> BY DEFENSE COUNSEL: He's asked us some questions . . . but they are just designed to embarrass the witness . . .
> . . .
>
> BY THE DEFENDANT: They're not telling you everything. There's other crimes, murders in Alabama and . . . attempted murders and all that in Alabama. Now, think about that and be fair about that. They're not going to be fair. I told y'all from the get-go what I wanted. I've been fighting my whole life. I'm tired of fighting the whole society . . .
> . . .
>
> BY THE DEFENDANT: You're wasting money. Go ahead. Y'all can kill me today. I don't care. Do it today. Do it today. No. No. I'm just saying they can do it today if that's what y'all want to do. Do it today and get it over with . . . .

¶31. After this outburst, Hutto's counsel renewed their motion to determine competence, which the trial judge denied. At the following day's proceedings, the trial judge noted that Hutto was actively participating in the proceedings and that his outbursts were not helping his cause. During the discussion, Hutto acknowledged he had "acted like a pompous ass or prima donna." He also objected to his own counsel's renewed motion to determine competence. On appeal, Hutto argues his actions are similar to those of the defendant in *Howard v. State*, 701 So. 2d 274 (Miss. 1997), and that the trial judge committed reversible

13

error by failing to order, sua sponte, that Hutto undergo another mental evaluation. We

disagree.

¶32.    As to the issue of competence, we have stated that

> "[I]f before or *during* trial the court, of its own motion or upon motion of an attorney, *has reasonable ground to believe* that the defendant is incompetent to stand trial the court shall order the defendant to submit to a mental examination by some competent psychiatrist selected by the court . . . ."
> . . .
>
> "What constitutes 'reasonable ground' to believe that a defendant is incompetent to stand trial rests largely within the discretion of the trial judge." On review, the pertinent question is whether "the trial judge received information which, objectively considered, should reasonably have raised a doubt about defendant's competence and alerted him to the possibility that the defendant could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense."

*Harden v. State*, 59 So. 3d 594, 601 (Miss. 2011) (emphasis added) (citations omitted).

¶33.    In *Howard*, we examined whether the trial judge erred by failing to hold a competency

hearing after witnessing the defendant's wholly ineffective self-representation.[5] *Howard v.*

*State*, 701 So. 2d 274 (Miss. 1997). At trial, the defendant attempted "to elicit information

about an imagined conspiracy so complicated that it never took shape even in his own mind"

and even suggested "that one of the jurors might have committed the crime." *Id.* at 278-79.

The record "reveal[ed] that Howard's effort was at best incoherent and deluded," and during

mitigation, Howard "made no opening or closing statement, made no objections, submitted

---

[5]We stated in *Hearn* that "[b]ecause Rule 9.06 now requires a formal competency hearing after a court-ordered mental examination, . . . *Howard* [is] no longer instructive with regard to whether or not a competency hearing should be held." *Hearn*, 3 So. 3d at n.11.

14

no mitigating evidence, and submitted no jury instructions." *Id*. at 279, 282. Ultimately, we concluded that the trial court erred by failing to order a competency hearing. *Id.* at 284.

¶34.    We find ***Howard*** distinguishable. A review of the transcript does not indicate that Hutto was incoherent and deluded during trial; rather, as the trial judge noted, Hutto actively participated in the proceedings and engaged in discussions with his counsel. Hutto's counsel also cross-examined some witnesses, stated objections, and presented mitigating evidence in the penalty phase. Further, Hutto exclaiming in the presence of the jury that he should receive the death penalty did not, per se, require the trial judge to order further mental evaluation. To hold otherwise would bring our criminal judicial system to a grinding halt.

¶35.    We conclude that Hutto's midtrial outburst was consistent with his outbursts before trial. A review of the transcript does not raise reasonable doubts that Hutto was competent; rather, it indicates that Hutto did not want to cooperate fully. *See **U.S. v. Flores-Martinez***, 677 F.3d 699, 707 (5th Cir. 2012) (noting a defendant is not incompetent because he or she refuses to cooperate). Indeed, Hutto even admitted that he was acting "like a pompous ass or prima donna." This assignment of error fails.

**II.    Whether the trial judge erred in admitting custodial statements Hutto had made to law-enforcement officials.**

¶36.    Prior to trial, Hutto sought to exclude from evidence statements he had made during four interrogations. The trial judge held a suppression hearing and ultimately allowed the State to admit highly redacted portions of each of the four interrogations. Hutto's second assignment of error consists of two arguments: first, Hutto claims his statements made to

15

law-enforcement officials after his arrest were involuntary because the police induced him to talk by offering him promises of rewards; and second, Hutto argues that the excerpts from the second, third, and fourth interrogations should not have been admitted because the interrogations occurred without counsel and after Hutto had invoked his Fifth Amendment rights. We analyze these arguments separately.

### A. Whether Hutto was offered promises for his cooperation.

¶37. Hutto claims for the first time on appeal that his statements made to law-enforcement officials were involuntary because "[e]arly in th[e] first interrogation, Hutto clearly seeks and receives promises that his cooperation will result in rewards for him." We note that Hutto's voluntariness argument at the trial level concerned whether his statements were inadmissible due to alleged physical violence during his arrest, not promises or rewards. Therefore, we will employ only plain-error review to determine if Hutto's "substantive or fundamental rights [were] affected." *Dickerson*, 175 So. 3d at 29-30 (citing *Foster v. State*, 148 So. 3d 1012, 1018 (Miss. 2014)). "Applying the plain-error rule, the Court must determine: (1) whether the trial court deviated from a legal rule; (2) whether the error is plain, clear, or obvious; and (3) whether the error prejudiced the outcome of the trial. *Id.* We will reverse the conviction only if the error "'resulted in a manifest miscarriage of justice.'" *Id*.

¶38. "Long before *Miranda* warnings were mandated by the U.S. Supreme Court, it was well settled in Mississippi jurisprudence that a confession [or statements] given after promises of leniency was incompetent as evidence." *Jones v. State*, 841 So. 2d 115, 129

16

(Miss. 2003) (quoting ***Dunn v. State***, 547 So. 2d 671, 674 (Miss. 1989)). The State has the burden to prove, beyond a reasonable doubt, that a confession is voluntary. ***Id***. at 130. "This burden [of making out a prima facie case of voluntariness] is met by the testimony of an officer, or other person having knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward." ***Id***.

¶39. We note that the Alabama police officers who interrogated Hutto testified at a suppression hearing that they never offered rewards or promises to Hutto for his cooperation. After a thorough review of the record, including all four interrogations conducted, we also find that Hutto's statements to law-enforcement officials were not induced by promises or rewards. Hutto points to a portion of the first interrogation in which an unidentified officer told Hutto that he should cooperate with law-enforcement officials. We note, however, that the unidentified officer did not promise Hutto that he would be given leniency or any type of reward for doing so. This issue fails.

> **B.**     **Whether statements admitted into evidence were taken in violation of Hutto's Fifth Amendment right to counsel**.

¶40. Next, Hutto asserts that redacted portions of the second, third, and fourth interrogations were improperly admitted at trial because these interrogations occurred after he had invoked his right to counsel and without an attorney present. We agree that it was error to submit the redacted portion of the second interrogation to the jury but conclude the error was harmless beyond a reasonable doubt.

17

**First Interrogation**

¶41.    Investigator Kwesi Drake of the Lee County, Alabama, Sheriff's Department conducted the first interrogation not long after Hutto's arrest on September 17, 2010. This interrogation took place at the Lee County Sheriff's Office and lasted approximately one hour and forty-two minutes. The redacted portion of the interrogation admitted at trial was forty-eight minutes long. Drake gave Hutto a warning pursuant to *Miranda v. Arizona* [6] and Hutto subsequently admitted going to the casino with Simpson and taking the Mercedes after Simpson's death. He claimed, however, that a man named Mark Cox killed Simpson. Hutto also told Drake that, while back in Alabama after Simpson's death, he told a woman named Melanie that he had won money at the casino and bought the Mercedes for her as a gift. Drake recounted some of Hutto's statements and further questioned Hutto. Later in the interrogation, Hutto asked Drake if he needed a lawyer, and shortly thereafter Hutto asked for a lawyer. Drake then terminated the interview.

**Second Interrogation**

¶42.    Approximately thirty minutes after the first interrogation, John Tanks and Marcel Walker of the Birmingham Police Department conducted a second interrogation of Hutto at the Lee County Sheriff's Office. The interview lasted two hours and nineteen minutes; the redacted portion admitted at trial lasted less than four minutes. The focus of this interrogation concerned the death of Hutto's aunt, Virginia "Faye" Rardon, and Tanks was unaware that

[6]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

18

Hutto had invoked his right to counsel in the prior interrogation. After being given a *Miranda* warning by Tanks, Hutto made the following statements, which were heard by the jury during the four-minute video played at trial:

> Hutto stated that he did not want to answer any questions, but instead wanted to make some statements. He stated that Mark Cox found him in Mississippi and followed him back to Alabama. Hutto claimed that he stayed in a hotel with a girl when he returned to Alabama. Officers Tank and Walker asked Hutto who the woman was, and Hutto stated it was a woman he met at a bar.
>
> Officer Tanks questioned Hutto about what happened after he and Mark Cox went to his Aunt Faye's house. Hutto stated that he and Mark Cox did not go to his aunt's house, but rather that he took the car he had from Mississippi (Simpson's Mercedes) straight to a motel where he spent the night after returning from Mississippi. Hutto claimed he woke up the next morning and called his Aunt Lois, who lived at his Aunt Faye's house. Hutto said he then went to his aunt's house, but that she would not let him stay at her house with the stolen Mercedes. Hutto stated that he then left his Aunt Faye's house and went to see a girlfriend named Melanie. Hutto told the officers that he lied to Melanie, telling her that he had won a bunch of money and had bought the Mercedes for her. He then told officers that while he was in Mississippi, an old woman tried to mess with him. Hutto told the detectives he had no reason to lie to them and that if they wanted to put him to sleep or shoot him in the head, it would make his day because he was now free.

¶43.    At this point, the detectives left and ended the interview.

**Third Interrogation**

¶44.    On September 22, 2010, Drake conducted another interview of Hutto at the Lee County Sheriff's Office. The interview concerned the events that occurred in Mississippi, including Simpson's death. The interrogation lasted two hours and thirteen minutes, and the redacted portion admitted at trial lasted seventeen minutes. Drake conducted this interview

19

only after Hutto had sent a request to speak to an investigator concerning the charges against him.

**Fourth Interrogation**

¶45.    On September 23, 2010, Tanks and Walker conducted another interview of Hutto concerning the death of Hutto's aunt, but Hutto made statements about Simpson as well. The interview took place at the Jefferson County Jail in Birmingham, Alabama, after Hutto had asked to speak with Tanks and Walker again. The interrogation lasted thirty minutes, but the jury heard only six and a half minutes of the interrogation. During the interrogation, Hutto claimed he had slept with Simpson on the day he met her and told law-enforcement officials they could kill him if they wanted to.

**Suppression Hearing**

¶46.    Both Drake and Tanks testified at a suppression hearing on this issue. The videos of the first and third interrogations were admitted during Drake's testimony, and the videos of the second and fourth interrogations were admitted during Tanks's testimony. Both Drake and Tanks testified that they never had threatened Hutto or offered him promises of rewards for cooperation. On cross-examination, Drake admitted that Hutto had invoked his right to counsel at the end of the first interrogation. Further, Tanks admitted on cross-examination that he and Detective Walker had questioned Hutto during the second interrogation. After arguments, the trial judge determined that parts of each interview would be admissible at trial. The trial judge determined that Hutto's second interrogation concerned a separate crime

and a completely different matter than the first interrogation and that Hutto was read his

rights in the second interrogation.

**Law**

¶47.    We previously have stated that:

> It is fundamental that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation. The Fifth and Fourteenth Amendment prohibition against self-incrimination requires that custodial interrogation be preceded by advising the defendant that he has the right to remain silent and the right to the presence of an attorney. If the subject indicates that he wishes to remain silent, then the questioning must stop; and if he requests counsel, the questioning must stop until an attorney is present.
>
> When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by proving that the accused responded to further police-initiated interrogation, *even if he has been advised or re-advised of his rights*. Furthermore, when an accused has expressed a desire to deal with the police only through counsel, further interrogation is absolutely barred until counsel has been made available to him, unless the accused himself initiates further communication.

*Balfour v. State*, 598 So. 2d 731, 744-45 (Miss. 1992) (emphasis added)(citations omitted).

The United States Supreme Court also has determined that it is irrelevant whether a law-

enforcement official conducting a second interrogation knew that the suspect had invoked

his Fifth Amendment right to counsel in a prior interrogation:

> Finally, we attach no significance to the fact that the officer who conducted the second interrogation did not know that respondent had made a request for counsel. . . . *Whether a contemplated reinterrogation concerns the same or a different offense, or whether the same or different law enforcement authorities are involved in the second investigation, the same need to determine whether the suspect has requested counsel exists*. The police department's failure to honor that request cannot be justified by the lack of diligence of a particular officer.

21

*Arizona v. Roberson*, 486 U.S. 675, 687-88, 108 S. Ct. 2093, 2101, 100 L. Ed. 2d 704 (1988) (emphasis added) (citation omitted).

¶48.   We find that Hutto's statements given in the second interrogation were taken in violation of his Fifth Amendment rights. Hutto clearly and unequivocally asked for counsel at the end of his first interrogation; therefore, it is immaterial that Officers Tanks and Walker, who conducted the second interrogation, were unaware that Hutto had invoked his rights in the prior interrogation. The State requests this Court to note that the United States Supreme Court stated in *Roberson* that the police "are free to inform the suspect of the facts of the second investigation as long as such communication does not constitute interrogation[.]" *Roberson*, 486 U.S. at 687. We conclude, however, that the police did more than inform Hutto of the second investigation involving his aunt; they interrogated him. The State's own brief concedes that questions were asked in this interview.

¶49.   But the admission of statements taken in violation of an accused's Fifth Amendment rights is "amenable to harmless error analysis." *Haynes v. State*, 934 So. 2d 983, 991 (Miss. 2006) (citing *Goodwin v. Johnson*, 132 F.3d 162, 181 (5th Cir. 1998); *United States v. Webb*, 755 F.2d 382, 392 (5th Cir. 1985)). "In order for a violation of a constitutional right to be held harmless, this Court must determine that the violation was harmless beyond a reasonable doubt." *Id*. (citing *Chapman v. California*, 386 U.S. 18, 23, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)). We have held that "errors involving a violation of an accused's constitutional rights may be deemed harmless beyond a reasonable doubt where the weight

22

of the evidence against the accused is overwhelming." *Id*. (quoting *Clark v. State*, 891 So. 2d 136, 142 (Miss. 2004)). Further, inadmissible statements that are cumulative of other admissible statements may render the admission of the statements harmless beyond a reasonable doubt. *Byrom v. State*, 863 So. 2d 836, 858 (Miss. 2003).

¶50.    We find that the admission of the redacted video of Hutto's second interrogation constituted harmless error beyond a reasonable doubt. Hutto's statements given in the second interview were exculpatory rather than inculpatory and cumulative of other properly admitted statements. In the second interrogation, Hutto mentioned Mark Cox, the stolen Mercedes, and attempting to give the Mercedes as a gift to a woman named Melanie. We note that all of these statements were cumulative of statements Hutto gave in the properly admitted first interrogation that took place thirty minutes prior to the commencement of the second interrogation.

¶51.    Further, Hutto's statement that an old woman in Mississippi tried to mess with him is cumulative of a statement given in Hutto's fourth interrogation. In the fourth interview, Hutto stated that Simpson was "a horny old broad" and that they slept together on the day they met. This later statement encompasses the statement in the second interview. Hutto's final statement in the second interview that the police could put him to sleep or shoot him in the head also is cumulative because, in the fourth interview, Hutto also stated that police could do whatever they wanted to him: "lethal-injection, firing squad, electric chair."

23

¶52. Finally, the trial judge did not err in admitting portions of the third and fourth interviews into evidence. Again, this Court has acknowledged that "when an accused has expressed a desire to deal with the police only through counsel, further interrogation is absolutely barred until counsel has been made available to him, *unless the accused himself initiates further communication*." **Balfour**, 598 So. 2d at 744-45 (emphasis added). The term "initiate" requires "more than the inquiry of simply 'who talks first.'" **Haynes**, 934 So. 2d at 989. For an **Edwards**[7] initiation to occur, the suspect must show "a willingness and a desire to talk generally about his case," and such a willingness must not be influenced by law-enforcement officials. **Id**. (quoting **U.S. v. Whaley**, 13 F.3d 963, 967 (6th Cir. 1994)).

¶53. Drake testified at trial that the reason for the third interrogation was because Hutto "sent up a request from the jail to speak to an investigator." Indeed, the last two interrogations began with law-enforcement officials stating they were meeting with Hutto because Hutto had asked to speak with them. In the third interrogation, Drake clearly said to Hutto: "I know you said you wanted to talk to somebody, but I still have to read you your rights." After his rights had been read, Hutto confirmed that no threats, promises, or rewards had been offered to him "whatsoever," and that he did "want to answer questions and make some statements." And at the beginning of the fourth interrogation, Tanks clearly stated to Hutto: "*you called us over here*, what do you need to tell us? But before we begin, I need to read you your rights." Tanks proceeded to read Hutto his rights, and Hutto waived his rights

---

[7] **Edwards v. Arizona**, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981).

24

before further questioning began. For these reasons, we find that Hutto reinitiated contact with law-enforcement officials, and, thus, the trial judge did not err in admitting portions of the third and fourth interrogations into evidence. Hutto's second assignment of error fails.

**III.     Whether the trial judge improperly admitted prejudicial and inflammatory post-autopsy photos.**

¶54.    Next, Hutto asserts that the trial judge improperly admitted four autopsy photos. He claims that "[w]hile these photos would assist a medically trained doctor in reaching a forensic opinion[,] they show nothing to a layman beyond the undisputed testimony." Hutto also argues that autopsy photos "are almost per se inadmissable." *Hurns v. State*, 616 So. 2d 313, 319 (Miss. 1993) ("Few autopsy photographs will meet the criteria of containing more probative value, as compared to being unfairly prejudicial or inflammatory, or overly gruesome."). In sum, Hutto states these photos were overly prejudicial and inflammatory.

¶55.    "On appeal, this Court will give great deference to trial judges in the sound exercise of their discretion in the admission of photographs[.]" *Bonds v. State*, 138 So. 3d 914, 919 (Miss. 2014). Though this discretion is not unlimited, it is "considerable," and we will reverse a trial judge's decision to admit a photograph only if he abused that discretion. *Id*. at n.2. In *Keller v. State*, we noted that

> In *Westbrook v. State*, 658 So. 2d 847, 849 (Miss. 1995), this Court found that photographs of a victim have evidentiary value when they aid in describing the circumstances of the killing, *Williams v. State*, 354 So. 2d 266 (Miss. 1978); describe the location of the body and cause of death, *Ashley v. State*, 423 So. 2d 1311 (Miss. 1982); or supplement or clarify witness testimony, *Hughes v. State*, 401 So. 2d 1100 (Miss. 1981).

*Keller v. State*, 138 So. 3d 817, 857 (Miss. 2014) (quoting *Le v. State*, 913 So. 2d 913, 955 (Miss. 2005), *overruled in part by **Bonds***, 138 So. 3d at 919).

¶56.    We find that the trial judge did not abuse his discretion in admitting the autopsy photos. Before admitting the photos, the trial judge conducted a Rule 403 balancing test and found the photos admissible. And at trial, Dr. Adele Lewis testified that Simpson had suffered numerous injuries which led to her death. Exhibits 64, 65, and 66 were introduced during Lewis's testimony as evidence that Simpson had suffered a "fracture or break in the spine." Lewis testified that these photos showed "bleeding in the muscles of the neck" and that such injuries "could be consistent with either a blow or with strangulation." Exhibit 67 also was introduced during Lewis's testimony as evidence that Simpson had suffered an ear-to-ear skull fracture. Lewis testified that the injury shown in the photo was consistent with blunt-force trauma. Lewis further stated that either the broken neck shown in Exhibits 64, 65, and 66 or the skull fracture shown in Exhibit 67 "could have caused [Simpson's] death by itself." Because the photos aided Lewis in describing "the circumstances of the killing" and "clarified her testimony," we find this issue to be without merit. *See **Keller***, 138 So. 3d at 857.

**IV.    Whether Hutto's Sixth Amendment right to confront the witnesses against him was violated.**

¶57.    During the investigation of Hutto, the Mississippi Crime Laboratory used blood taken from Simpson's autopsy to make a bloodstain card. Hinds County Sheriff's Department Investigator Greg Lewis, a chain-of-custody witness, testified that he had retrieved the

bloodstain card from the crime lab and delivered it to Scales Bio Lab for DNA testing. The testing would determine if Simpson's blood matched a substance found on Hutto's Nike flip-flop that he wore on the night of Simpson's disappearance. During cross-examination, the defense asked Lewis whether the bloodstain card he received from the crime lab was the first or second card that he had taken to the bio lab. The State objected because the trial judge had not yet ruled on a motion in limine seeking to exclude any testimony that the crime lab initially had mislabeled Simpson's bloodstain card with the incorrect crime lab number. The trial judge accepted a proffer from Kristy Fuson, an employee of the crime lab, on the issue.

¶58.    Fuson stated that all cases at the crime lab are assigned case numbers. Simpson's case number was SME No. 10-1136, but the labels to be attached to Simpson's files were transposed with the number "8" instead of the number "6." Thus, the first bloodstain card that Lewis delivered to the bio lab was labeled with the number "10-1138." When tested at the bio lab, the bloodstain card generated a male profile. After a male profile was generated from "Simpson's" bloodstain card during DNA testing, the bio lab informed the crime lab of this finding. The crime lab found the error and then relabeled Simpson's actual bloodstain card with the correct case number; it was then delivered by Lewis to the bio lab. Kathryn Rodgers, a forensic DNA analyst, later determined the substance on Hutto's flip-flop to be Simpson's blood. Rodgers testified as to her conclusions at trial, noting that the result was a match frequency of less than one in 276 billion.

¶59. After the proffer, the trial judge granted the State's motion in limine. The trial judge found the mislabeling at the lab was irrelevant or, alternatively, would create juror confusion. On appeal, Hutto argues that his constitutional right of confrontation was violated when the trial judge ruled Hutto could not cross-examine witnesses about the error in the lab. We agree that the trial judge should have allowed cross-examination about the mislabeling, but we determine this error to be harmless beyond a reasonable doubt.

¶60. "Defendants in criminal cases have a fundamental constitutional right to be confronted with witnesses against them." *Armstead v. State*, 196 So. 3d 913, 917 (Miss. 2016) (citing U.S. Const. amend. VI; Miss. Const. art. 3, § 26 (1890)). And "[t]he right of a criminal defendant . . . to cross examine witnesses against him is at the heart of the [C]onfrontation [C]lause." *Id.* (quoting *Lanier v. State*, 533 So. 2d 473, 488 (Miss. 1988)). The right of confrontation "extends to and includes the right to fully cross examine the witness on every material point relating to the issue to be determined that would have a bearing on the credibility of the witness and the weight and worth of his testimony." *Scott v. State*, 796 So. 2d 959, 964 (Miss. 2001) (quoting *Myers v. State*, 296 So. 2d 695, 700 (Miss. 1974)).

¶61. Hutto claims the United States Supreme Court opinions *Bullcoming v. New Mexico*, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011), and *Melendez-Diaz v. Massaschusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), support his argument that reversible error was committed. But at issue in those cases was whether testimonial statements or documents were admitted against the defendant without being

accompanied by proper witness testimony. *See Armstead*, 196 So. 3d at 918. We noted in *Armstead* that

> [u]nder *Melendez-Diaz* and *Bullcoming*, forensic reports created specifically to serve as evidence against an accused at trial are among the "core class of testimonial statements" governed by the Confrontation Clause. *Melendez-Diaz*, 129 S. Ct. at 2532; *Bullcoming*, 131 S. Ct. at 2717. The Confrontation Clause prohibits the introduction of these testimonial documents through the "surrogate testimony" of a witness who had no involvement in the creation of those documents. *Bullcoming*, 131 S. Ct. at 2709.

*Id*.

¶62.    Rodgers, the bio lab analyst, was the only witness for the State who testified about forensic DNA testing. Further, she testified about her own specific findings and conclusions, not the findings of another person. The trial judge did not allow the State to introduce testimonial hearsay against Hutto and, therefore, the *Melendez-Diaz* and *Bullcoming* decisions do not require reversal of Hutto's conviction.

¶63.    Hutto also directs this Court to *Terry v. State*, 718 So. 2d 1115 (Miss. 1998). In *Terry*, a jury convicted the defendant of embezzling. *Terry v. State*, 718 So. 2d 1115, 1117 (Miss. 1998). At trial, a witness for the State testified that a document at issue "could not be altered." *Id.* at 1125. During cross-examination of the witness, defense counsel attempted "to introduce a counterfeit document[] to prove that an altered document could have been substituted for the real one[,]" but the trial judge did not allow the attorney to do so. *Id*. This Court held that Terry "was denied her right to cross-examine" when the trial judge prevented defense counsel from impeaching the witness's assertion "with the 'fake' [document]. " *Id*.

¶64. This case is distinguishable from *Terry* because, in that case, the defendant was denied her right to impeach a witness about a statement the witness had offered to the court. Here, Hutto merely was denied the opportunity to show the jury that Simpson's bloodstain card initially was mislabeled. The trial judge allowing cross-examination on this point would not have changed the fact that, when Simpson's actual bloodstain card was compared to the substance found on Hutto's flip-flop, it resulted in a match frequency of less than one in 276 billion. Defense counsel also failed to request a proffer of Lewis or any other witness to articulate any prejudice on this issue. We find that the trial judge's failure to allow defense counsel to question Lewis about the error in the lab did not prejudice the outcome of the trial.

V. **Whether Hutto's motion for a mistrial should have been granted after a jail administrator testified he had received "threats" from Hutto.**

¶65. Next, Hutto argues that a request for a mistrial should have been granted. Michael Ivy, a former jailhouse administrator with the Hinds County Sheriff's Department, testified for the State. During Ivy's testimony, the State admitted two letters that Hutto had written to the district attorney's office. After testifying to the substance of the letters, the following exchange took place between counsel for the State and Ivy:

> Q. And would [Hutto] generally give you correspondence, Captain Ivy?
>
> A. Yeah. He gave me quite a bit of correspondence and notes *and threats* and all kind of stuff.

Defense counsel immediately moved for a mistrial, and the trial judge denied the motion.

¶66. We employ an abuse-of-discretion standard of review to determine whether a trial judge erred in denying a request for a mistrial. *Pitchford v. State*, 45 So. 3d 216, 240 (Miss. 2010). A trial judge need declare a mistrial only "when there is an error in the proceedings resulting in substantial and irreparable prejudice to the defendant's case." *Id*. (quoting *Parks v. State*, 930 So. 2d 383, 386 (Miss. 2006)).

¶67. Hutto cites *Rose v. State*, 556 So. 2d 728 (Miss. 1990), and *Sample v. State*, 643 So. 2d 524, 528-29 (Miss. 1994), to support his argument that the trial judge should have granted a mistrial. In *Rose*, the defendant was indicted for conspiracy to commit larceny. *Rose*, 556 So. 2d at 729. During cross-examination at trial, the State questioned the defendant about arson and the fact that her house burned down. *Id.* at 730-31. On appeal, we found that the defendant "did not place her character at issue" and concluded that the effect of cumulative errors denied Rose a fair trial. *Id*. at 731, 735.

¶68. In *Sample*, a jury convicted the defendant of possession of marijuana with intent to distribute. *Sample*, 643 So. 2d at 528-29. The defendant was arrested while driving a black Camaro. *Id*. The officer who arrested Sample testified that his attention was drawn to the Camaro because "it was parked at a residence where a shooting had occurred a week earlier" and he "had received official information at a pre-patrol briefing that a car matching the description of the black Camaro had recently been stolen." *Id*. We reversed the defendant's conviction, finding the testimony about the shooting and stolen car "was unduly prejudicial in that it allowed an inference that Sample was engaged in other crimes." *Id*. at 529.

31

¶69. We find **Rose** and **Sample** distinguishable, as both of those cases involved direct evidence of other possible crimes. Though Ivy should not have testified about receiving "threats," the passing reference was too vague and nondescript to amount to evidence of other crimes or bad acts. *See* Miss. R. Evid. 404(b). Further, this testimony was not introduced to show that Hutto was the kind of person who would commit capital murder. *See id.*; *see also* **Rose**, 556 So. 2d at 730. Ivy's brief reference did not result "in substantial and irreparable prejudice to the defendant's case." **Pitchford**, 45 So. 3d at 240.

## VI. Whether evidence of the victim's character was admitted improperly during the trial.

¶70. Hutto next contends that the trial judge erred in allowing the State repeatedly to elicit testimony concerning Simpson's character and reputation "designed to do nothing but prejudice the jury against Hutto." Hutto points to multiple instances in which he argues error occurred.

### The State's Opening Statement

¶71. During the prosecution's opening statement, counsel stated:

> You're going to hear that Ethel Simpson was 81 years old at the time of her death. But don't let her age fool you. She was lively, she was vivacious, she loved to socialize, she had a very busy life. She was survived by a son, Ken Simpson, who described his mother as social. She loved to travel, she loved to eat and she loved people.

The defense objected, claiming the statements concerning Simpson's character were improper. The State countered that these statements were going to come into the

32

prosecution's case-in-chief to indicate why she was targeted by Hutto. Counsel for the State continued:

> Again, Ethel Simpson was vivacious, she was alive and she was full of life. Ken Simpson, her son, described her as colorful in the way she dressed. She also died [sic] her hair bright red. She was a lover of people. And one of the qualities that people loved so much about Ethel was how much she loved people and how outgoing she was. And what you'll come to find out is that's one of the reasons that led to her demise and that's one of the reasons that she's not here today and that's one of the reasons why James Hutto targeted her.

> You'll hear that Ethel Simpson was widowed in 2005 when her husband died of lung cancer.

After these statements, defense counsel asked for a continuing objection to all victim character evidence. On appeal, Hutto argues these statements prejudiced the jury against him.

¶72. Though these statements concerned the victim's character, we find these statements "set the stage for the presentation of relevant evidence." *Goff v. State*, 14 So. 3d 625, 652 (Miss. 2009)). In *Goff*, we reiterated that "the purpose of an opening statement is to inform the jury what a party to the litigation expects the proof to show." *Id*. at 652 (quoting *Slaughter v. State*, 815 So. 2d 1122, 1131 (Miss. 2002)). "Attorneys are also allowed a wide latitude in arguing their cases to the jury, including opening statements and closing arguments." *Dycus v. State*, 875 So. 2d 140, 170 (Miss. 2004), *sentence vacated by Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (citing *Sheppard v. State*, 777 So. 2d 659, 661 (Miss. 2000)). And further, opening statements "do not constitute evidence." *Goff*, 14 So. 3d at 652.

33

¶73.    In **Dycus**, the prosecution claimed in its opening statement that the victim was seventy-six years old, had lived in the same house for forty years, and made cookies for neighbors. **Dycus**, 875 So. 2d at 870. And in its closing argument, the State told the jury that the victim "had recently recovered from a serious bout with cancer." **Id**. On appeal, Dycus alleged that such statements were irrelevant and inflammatory, but we concluded "that the relatively minor statements" about the victim did not result "in prejudice so substantial that it influenced the outcome of the trial." **Id**.

¶74.    The only caselaw Hutto cites in support of his position is **Wiley v. State**, 484 So. 2d 339 (Miss. 1986), *vacated by* **Wiley v. State**, 635 So. 2d 802 (Miss. 1993). In that case, this Court "held that in death penalty cases, as in other cases, the victim's character is ordinarily not at issue and reference thereto is improper." **Mack v. State**, 650 So. 2d 1289, 1324 (Miss. 1994) (citing **Wiley**, 484 So. 2d at 348). But we also have "held that such evidence as is relevant to the crime charged is admissible, notwithstanding an objection that it bears on the victim's character." **Id**. Indeed, "evidence of the victim's character is admissible if it is relevant to the crime." **Dycus**, 875 So. 2d at 870; *see also* **Randall v. State**, 806 So. 2d 185, 225 (Miss. 2001); **Hansen v. State**, 592 So. 2d 114, 146-47 (Miss. 1991).

¶75.    We find no error in the prosecution's statements above. Again, opening statements do not constitute evidence, and the State is allowed to argue its theory of the case. Moreover, the statements about Simpson's outgoing character did "set the stage for the presentation of relevant evidence." *See* **Goff**, 14 So. 3d at 625. As shown in the trial transcript, a witness for

34

the State testified that Hutto catered "his story to the people that were around him [at the Healthplex] to try to entice people and pull people in." Further testimony was elicited during the State's case-in-chief that Hutto claimed to have the same type of cancer that Simpson's husband had died from. The "relatively minor statements" concerning Simpson's character followed the State's theme that Hutto had manipulated an outgoing and social Simpson. *Dycus*, 875 So. 2d at 170.

### Bible-Study Testimony

¶76. Hutto further argues he was prejudiced when the jury heard testimony that Simpson participated in Bible study. At trial, Daty Rochelle testified that she and Simpson were "friends." Counsel for the State asked Rochelle how she knew the victim, to which Rochelle responded: "I knew her from a Bible study at First Baptist in Clinton. She was in a small – she and I were in a small group together." The prosecution then moved on to questions concerning Rochelle's encounter with Hutto and Simpson at the Heathplex.

¶77. Simply put, the State asked the witness how she knew the victim, the witness answered, and the State moved on. Hutto cites no caselaw showing that such testimony is improper. The testimony of how Rochelle knew Simpson is relevant for the purpose of Rochelle's credibility and personal knowledge of the events in question.

### Statement from Simpson's Brother

¶78. Hutto objected at trial to testimony given by Simpson's brother and roommate, Thomas Winstead. On direct examination, the prosecution asked Winstead why he and

Simpson lived together. Winstead responded: "Well, [we were] just kind of looking after each other." Again, this is simply a background question concerning how the witness knew the victim and resulted in no prejudice to Hutto.

**Photo of the Victim**

¶79.	Hutto also objected to the introduction of a photo of Simpson during the testimony of her son, Ken Simpson. The prosecution countered that the photo was "relevant for the purpose of identification" and the judge admitted the photograph into evidence.

¶80.	In *Spicer v. State*, this Court noted that "[t]he trial judge has discretion to determine whether or not photographs have a legitimate evidentiary purpose." *Spicer v. State*, 921 So. 2d 292, 306 (Miss. 2006) (citing *Walker v. State*, 671 So. 2d 581, 601 (Miss.1995)). In *Spicer*, the State introduced, and the trial judge admitted, a photo of the victim "for identification purposes." *Id*. at 307. On review, we determined that "[s]ince the trial court admitted the photograph of [the victim] for a legitimate evidentiary purpose and there was nothing otherwise prejudicial about the picture itself," the trial judge did not err in admitting the photograph. *Id*.

¶81.	As in *Spicer*, the State sought to introduce the picture of Simpson for the purpose of identification. And having viewed the photograph, we find nothing prejudicial about the photograph itself. The photo does not show Simpson with her family or any other person; rather, it is simply a professional photo of Simpson. No error occurred here.

**Testimony of Jan Cossitt**

¶82.    Hutto also claims testimony from Jan Cossitt, an employee of the Healthplex, prejudiced him. When asked how she knew the victim, Cossitt testified:

> Ethel is a – was a longtime member of the Baptist Healthplex, also a friend, a member of the church that I attended and a member of an organization called the Red Hat Society, which is group of ladies 50 years of age and above who get together at least once a month to have a meal together or participate in some program.

When the State asked what Simpson was like, Cossitt testified:

> A. Probably one of the most generous, giving people I've ever met in my life. Never met a stranger.
>
> Q. She never met a stranger?
>
> A. No.

¶83.    Again, these statements did not "result in prejudice so substantial that it influenced the outcome of the trial." *Dycus*, 875 So. 2d at 870. The first statement from Cossitt is simply a background question concerning how Cossitt knew Simpson. And as for the second statement, we again point out that "evidence of the victim's character is admissible if it is relevant to the crime." *Id*. The testimony that Simpson was "generous" and "never met a stranger" could reasonably indicate why she, an elderly woman, took Hutto, a younger man with no automobile, home from the gym, to the casino, and bought him dinner. We find no merit in this assignment of error.

**VII.   Whether the trial judge erred in denying Instruction D8 on intoxication.**

¶84.    Hutto argues that the trial judge committed reversible error by denying Instruction D-8.[8] He claims that the jury heard evidence that suggested he was intoxicated on the day he met Simpson and should have been granted an intoxication instruction. He points to the testimony of Wayne Terrell, an employee at the Healthplex. Terrill stated that Hutto "seemed a little bit strange . . . like he was maybe on something." On cross-examination, defense counsel asked Terrell if Hutto was "acting like he was on steroids." Terrell responded: "No, not necessarily steroids. Maybe some kind of speed or something." Terrell ultimately stated that Hutto "just seemed like he was kind of amped up."[9] Another employee of the Healthplex, Keith Montgomery, testified that Hutto seemed "overzealous" and "eager to talk to people

---

[8]The instruction stated:

> You have also heard evidence that Mr. Hutto appeared to be under the influence of some substance, i.e., intoxicated. "Intoxicated" means: being under the influence of alcohol or drugs or both. Some degrees of intoxication may prevent a person from having the requisite intent to commit an offense. If, after considering the evidence of intoxication, together with all the other evidence, you have a reasonable doubt that Mr. Hutto had the specific intent to commit a material element of the offense charged, the you must find Mr. Hutto not guilty of the offense.

[9]Hutto also points to the testimony of Melanie McKissack and Jack Wilson for the proposition that Hutto was intoxicated. McKissack described Hutto as "really, really wired up on something." And Wilson testified that Hutto was acting "crazy, delusional, just crazy, scary acting." We note, however, that these witnesses testified about how Hutto behaved in the days after Simpson's disappearance while Hutto was back in Alabama. The testimony from these witnesses does not speak to how Hutto acted on the day he met and purportedly killed Simpson.

38

that were in the facility." Jan Cossitt testified that Montgomery mentioned that Hutto had "been kind of acting out of the ordinary" at the Healthplex.

¶85.   Hutto acknowledges that voluntary intoxication is not a defense to a specific-intent crime. Indeed, "[t]he law in Mississippi is clear that *voluntary* intoxication is not a defense to a specific-intent crime." *Hale v. State*, 191 So. 3d 719, 724 (Miss. 2016) (emphasis in original) (citing *McDaniel v. State*, 356 So. 2d 1151, 1161 (Miss. 1978)). Hutto suggests, however, that involuntary intoxication may be a defense. In *Hale*, we noted that this Court "has not addressed whether Mississippi law recognizes the defense of *involuntary* intoxication." *See Hale*, 191 So. 3d at 724 (emphasis in original).

¶86.   But regardless of whether we would recognize such a defense, Hutto presented no facts at trial suggesting he was involuntarily intoxicated. "Jury instructions should be given only when facts developed in the case being tried support them." *Simons v. State*, 805 So. 2d 452, 473 (Miss. 2001). Hutto acknowledges in his own brief that "[t]here was no testimony regarding how Hutto may have become intoxicated–voluntarily or *involuntarily*." Even more, a review of the record does not suggest Hutto was intoxicated at all at the time of Simpson's death. The above-mentioned testimony concerned Hutto's behavior at the Healthplex, hours before he purportedly killed Simpson. This assignment of error fails.

## VIII.   Whether the prosecution abused its discretion in seeking the death penalty against Hutto.

¶87.   Hutto alleges the prosecution abused its discretion by seeking the death penalty against him but not seeking the death penalty in a factually similar case involving a defendant

named George Affleck.[10] Hutto contends his equal protection rights were violated because the State had no rational basis to pursue the death penalty in his case and that the State discriminated against him based on socioeconomic factors. Hutto also claims the prosecution allowed the victim's family to direct the prosecution in violation of Mississippi Code Section 99-43-17. We disagree.

¶88.    "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bodenkircher v. Hayes*, 434 U.S. 357, 364, 98 S. Ct. 663, 669, 54 L. Ed. 2d 604 (1978). This discretion is permissible "so long as the selection was [not] deliberately *based upon an unjustifiable standard such as race, religion, or other arbitrary classification.*" *Id.* at 364 (citing *Oyler v. Boles*, 368 U.S. 448, 456, 82 S. Ct. 501, 506, 7 L. Ed. 2d 446 (1962)) (internal quotations omitted) (emphasis added); *see also Furman*, 408 U.S. at 242 ("It would seem to be incontestable that the death penalty inflicted on one defendant is 'unusual' if it discriminates against him by reason of his race, religion, wealth, social position, or class, or if it is imposed under a procedure that gives room for the play of such prejudices.").

¶89.    Hutto is, in essence, asserting a selective-prosecution claim. "A selective-prosecution claim is an independent assertion of misconduct by a prosecutor and not a defense on the

---

[10]As shown in a recent Court of Appeals decision, a jury convicted George Affleck of capital murder and felony possession of a firearm, but no death sentence was sought in his case. *See Affleck v. State*, 210 So. 3d 1067, 1074 (Miss. Ct. App. 2015).

merits to the criminal charge itself." ***Fox v. State***, 129 So. 3d 208, 218 (Miss. Ct. App. 2013) (quoting ***United States v. Armstrong***, 517 U.S. 456, 463, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996)) (internal quotations omitted). In order to succeed in a selective-prosecution claim, "[t]here must be clear evidence to rebut the presumption that the prosecutor acted lawfully." ***Id***. (citing ***Armstrong***, 517 U.S. at 465). Therefore, the burden is not on the State to show a rational basis for seeking the death penalty; rather, the burden is on Hutto to clearly show that the prosecution acted unlawfully based on arbitrary standards.

¶90.   Hutto cites United States Census data purporting to show that Simpson (the victim here) lived in suburban Clinton, Mississippi, whereas Ms. Hearn (the victim in Affleck's case) lived in south Jackson, Mississippi. Hutto also states he is indigent and has appointed counsel but Affleck was able to retain counsel. Hutto provides no further facts on the socioeconomic status of the victims and defendants in these cases.

¶91.   We find these bare-bones allegations insufficient to show any discrimination occurred. It would be utter speculation for this Court to determine that Simpson had a better socioeconomic status than Ms. Hearn solely because she lived in Clinton instead of Jackson. Further, we agree with the State that the ability to proceed with retained counsel is far from a complete picture of one's socioeconomic status. In sum, the record is devoid of evidence showing the prosecution arbitrarily sought the death penalty against Hutto.

¶92.   Moreover, Hutto's argument that the State violated Mississippi Code Section 99-43-17 is without merit. The statute states that "[t]he rights of the victim do not include the authority

to direct the prosecution of the case." Miss. Code Ann. § 99-43-17 (Rev. 2015). In looking at the record, we easily find that the prosecution did not delegate the decision of whether or not to seek the death penalty to Simpson's family. Instead, the record shows that the State sought the death penalty after Hutto rejected a plea deal. This assignment of error fails.

## IX. Whether the trial judge allowed the State to introduce speculative opinion testimony at both the guilt and sentencing phases.

¶93. Simpson's body was found on a hog farm and partially covered by a hog-feed-container. Prior to trial, Hutto filed a motion in limine to prohibit witnesses for the State from testifying that red stains on the container "appeared to be blood" because no testing occurred to show the substance was in fact blood. Hutto also argued that the crime-scene investigator who would testify, Hinds County Sheriff's Department Investigator Eric Rather, lacked first-hand knowledge or observation of the red substance. The trial judge did not rule on the motion in limine at that time.

¶94. Later at trial, Rather did testify that "red stains that appeared to be blood" were found on the hog-feed container. On cross-examination, Rather admitted that he did not take any samples to send to the lab to determine if the red substance was blood. On redirect, Rather testified that he had been to "hundreds" of crime scenes and around twenty-five murder scenes. He further testified that he had observed blood at prior crime scenes.

¶95. We find that Hutto is barred from asserting this argument. A moving party has a duty to ensure his motion is heard and that a ruling on the motion is obtained. *See **Lambert v. State***, 518 So. 2d 621, 632 (Miss. 1987). David Cox, a patrol officer with the Hinds County

Sheriff's Office, testified without objection that the red substance on the container appeared to be blood. Cox testified before Rather, and therefore, the jury already had heard this testimony on this issue.

¶96. We also note briefly that Hutto's claim also lacks merit, as Rather's testimony was proper under Mississippi Rule of Evidence 701. [11] The record clearly indicates that Rather personally observed the red substance while taking photos of the crime scene. And because Rather's testimony concerned the crime scene and the condition of the victim's body, Rather's opinion was "helpful to the clear understanding" of his testimony and a fact at issue. *See* M.R.E. 701. Lastly, Rather also testified that he had been to hundreds of crime scenes and had observed blood at many of those scenes; thus, his testimony was a proper lay opinion.

### *Sentencing Stage*

¶97. Building on his argument above, Hutto also agues that the trial judge erred in allowing the State to submit the "heinous, atrocious, or cruel" (HAC) aggravating circumstance. *See* Miss. Code Ann. § 99-19-101(5)(i) (Rev. 2015). Hutto asserts that Rather's testimony that the substance on the container "appeared to be blood" was the only basis to submit the HAC

---

[11] If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to the clear understanding of the testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

aggravator. He further asserts that the State's theory that Simpson may have remained conscious for some time during the beating which caused her death was contradicted by the State's own pathologist.

¶98. To uphold the submission of the HAC aggravator, there must be evidence that the offense in question "was accompanied by such additional acts as to set the crime apart from the norm of capital felonies – the conscienceless or pitiless crime which is unnecessarily torturous to the victim." ***Ronk v. State***, 172 So. 3d 1112, 1143 (Miss. 2015) (quoting ***Lockett v. State***, 614 So. 2d 888, 896 (Miss. 1992)). "This Court has held that '[t]he number of wounds . . . and the fact that death was not immediate, but prolonged' may all be considered as evidence supporting a jury's finding of the HAC aggravator." ***King v. State***, 960 So. 2d 413, 441 (Miss. 2007) (citing ***Manning v. State***, 735 So. 2d 323, 349-50 (Miss. 1999)). Additional factors that may be considered under the HAC aggravator include "whether the defendant inflicted physical pain before death, the mental anguish and physical torture suffered by the victim prior to death, and the vulnerability of the victim." ***Ronk,*** 172 So. 3d at 1143 (quoting ***Bennett v. State***, 933 So. 2d 930, 954 (Miss. 2006)).

¶99. Hutto strenuously argues that there is no evidence regarding the length of time Simpson remained conscious during the assault that ended her life. He points to ***Taylor v. State***, 672 So. 2d 1246, 1275-76 (Miss. 1996), and ***Lockett v. Puckett***, 980 F. Supp. 201, 228 (S.D. Miss. 1997), *rev'd in part, appeal dismissed in part sub nom.* ***Lockett v. Anderson***, 230 F.3d 695 (5th Cir. 2000). In both of those cases, the reviewing court determined that the

44

HAC aggravator should not have been submitted to the jury because there was no evidence as to the length of time the victim remained alive after suffering a lethal injury. *Taylor*, 672 So. 2d at 1276; *Lockett*, 980 F. Supp. at 228.

¶100.  But notwithstanding those decisions, "[t]his Court has rejected the notion that the victim's 'ability to remain conscious' after sustaining the lethal wounds has any relevance to this issue." *King*, 960 So. 2d at 441; *see also* *Underwood v. State*, 708 So. 2d 18, 40 (Miss. 1998) ("Our case law is replete with cases where the length of time that it took the victim to die was not considered to be dispositive on appeal."). The length of time it took the victim to die is only one factor to consider. *Id*.

¶101.  We disagree with Hutto's assertion that Rather's testimony was the only evidence to support the submission of the HAC aggravator. Dr. Adele Lewis testified that Simpson suffered blunt-force injuries to the head, soft-tissue defects, an ear-to-ear skull fracture, bleeding in the neck muscles, a crushed windpipe, and a fractured spine, i.e., a broken neck. Lewis further testified that the pooling of blood in Simpson's neck was consistent with either a blow or strangulation. Lewis stated that the ear-to-ear skull fracture Simpson suffered was caused by the type of force one would see in a car wreck or by falling from a great height. Admittedly, Lewis stated that, after suffering either the broken neck or skull fracture, Simpson likely lost consciousness "quite quickly." But Lewis did not opine that these injuries occurred before the four other injuries. When asked if Simpson essentially was beaten to death, Lewis responded affirmatively.

45

¶102. We find sufficient evidence to support the submission of the HAC aggravator. Lewis determined Simpson suffered at least six distinct injuries. Further, Simpson was a vulnerable victim, as she was eighty-one years old. Simpson suffered a grisly murder "apart from the norm of capital felonies." *Ronk*, 172 So. 3d at 1143.

¶103. Within this argument, Hutto also claims the trial judge relied on speculative testimony to submit the HAC aggravator to the jury. During argument on this issue at trial, the State claimed that there were hand prints in the smeared red substance on the hog feed container. On appeal, Hutto argues that there actually was no testimony claiming hand prints were present in the red substance; thus, he argues that the State misled the judge. But regardless of whether hand prints or impressions were on the container, we find sufficient evidence was presented to support the submission of this aggravator.

## X. Whether the trial court erred by allowing the State to submit the "prior violent felony" aggravating circumstance to the jury.

¶104. Before the sentencing phase, the parties presented arguments as to whether Hutto previously had been convicted "of a felony involving the use or threat of violence." *See* Miss. Code Ann. § 99-19-101(5)(b) (Rev. 2015).[12] The prosecution offered the certified felony conviction of Hutto for the crime of Sexual Abuse in the First Degree under Alabama

[12](5) Aggravating circumstances shall be limited to the following:
 . . .
 (b) The defendant was previously convicted of another capital offense
 or *of a felony involving the use or threat of violence to the person*.

Miss. Code Ann. § 99-19-101(5)(b) (Rev. 2015) (emphasis added).

46

Criminal Code Section 13-A-6-66.[13] In the indictment for this crime, the grand jury charged that Hutto "did subject [the victim] to sexual contact by forcible compulsion, in violation of 13A-6-66 of the Code of Alabama." Relying on *Holland v. State*, 587 So. 2d 848 (Miss. 1991), and *Hughes v. State*, 892 So. 2d 203 (Miss. 2004), the trial judge determined an element of Section 13-A-6-66 involved the use or threat of violence or inherently violent conduct. This aggravator was submitted to the jury and found beyond a reasonable doubt. On appeal, Hutto argues the trial judge incorrectly applied our decision in *Holland*.

¶105.   In *Holland*, we vacated a defendant's death conviction and remanded the case to a new sentencing jury after the jury engaged in premature penalty deliberations. *Holland*, 587 So. 2d at 874-75. In addition, we "place[d] the State on notice regarding a matter relating to the evidentiary sufficiency of the aggravating circumstance—previously convicted of . . . a felony involving the use or threat of violence to the person." *Id*. (citing Miss. Code Ann. § 99-19-105(5)(b)) (internal quotations omitted)). We noted that:

---

[13]Section 13A-6-66 states, in full, that:

> (a) A person commits the crime of sexual abuse in the first degree if:
>> (1) He subjects another person to sexual contact by forcible compulsion; or
>> (2) He subjects another person to sexual contact who is incapable of consent by reason of being physically helpless or mentally incapacitated.
> (b) Sexual abuse in the first degree is a Class C felony.

Ala. Code § 13A-6-66.

47

Although a trial court is not required to examine the underlying legal validity of the prior conviction, determining whether a defendant's prior conviction was a felony involving the use or threat of violence requires that this state's statutes be construed and applied. Where as here the conviction occurred in a sister state, this Court does not look to how that state characterizes the question of whether the crime was one of violence, rather, the analysis must be done under Mississippi law. *For a conviction to qualify as predicate for an aggravating circumstance under this state's statutes, the conviction from the sister state must have been acquired under a statute which has as an element the use or threat of violence against the person or, by necessity, must involve conduct that is inherently violent or presents a serious potential risk of physical violence to another*.

*Id*. (emphasis added) (citations omitted).

¶106.  Hutto asserts that this language from **Holland** required the trial judge to look to the closest statute Mississippi has to the foreign offense and determine if the similar offense is a *felony* in Mississippi. Hutto states the closest crime Mississippi has to Section 13A-6-66 is the prohibition against fondling under Mississippi Code Section 97-5-23(1).[14] And though fondling under Section 97-5-23(1) is a felony, Hutto argues that, due to the victim in the

---

[14] The statute states, in part:

Any person above the age of eighteen (18) years, who, for the purpose of gratifying his or her lust, or indulging his or her depraved licentious sexual desires, shall handle, touch or rub with hands or any part of his or her body or any member thereof, or with any object, any child under the age of sixteen (16) years, with or without the child's consent, or a mentally defective, mentally incapacitated or physically helpless person as defined in Section 97-3-97, shall be guilty of a felony . . . .

Miss. Code Ann. § 97-5-23(1) (Supp. 2016).

Alabama case being seventeen years old,[15] his conviction cannot be introduced because fondling a person over the age of consent would not be a felony in Mississippi.

¶107. Hutto misconstrues *Holland* by reading it in a way that requires the trial judge to apply Mississippi law to determine whether the foreign offense would also qualify as a felony in Mississippi. We find it sufficient that Sexual Abuse in the First Degree is a felony in Alabama. *See* Ala. Code § 13A-6-66(b). What *Holland* does require is that the "prior conviction from another state . . . be analyzed under Mississippi law *to determine whether it is one of violence*." *Hughes*, 892 So. 2d at 211 (emphasis added). Hutto admits that his felony conviction under Section 13A-6-66 contained an element of violence, as an element of the Alabama crime is forcible compulsion. Therefore, this assignment of error is without merit.

## XI. Whether the trial court erred in excluding mitigation evidence from Hutto's exwife and a social worker.

¶108. Hutto argues his death sentence should be vacated because the trial court excluded certain statements by his ex-wife, Katherine Hutto, and a social worker, Dr. Julie Schroeder, that "were essential to Hutto's presentation of his mitigation." We analyze the exclusion of Katherine Hutto's and Dr. Schroeder's testimony separately.

---

[15]This finding is not supported by the indictment, but the victim's age was presented to the trial judge in argument on the issue.

**Katherine Hutto**

¶109. Hutto's ex-wife, Katharine Hutto, attempted to testify that Hutto had told her, during their marriage, that he had been sexually abused as a child. The State objected, arguing the question called for hearsay. The trial court sustained the State's objection. Hutto argues that the trial court erred in excluding Katherine's testimony, asserting the Mississippi Rules of Evidence do not apply at the mitigation phase.

¶110. This Court recently stated that "[a]s to the issue of hearsay, the Rules of Evidence *do not apply* to sentencing hearings." ***Burgess v. State***, 178 So. 3d 1266, 1280 (Miss. 2015) (quoting ***Wilson v. State***, 21 So. 3d 572, 587-88 (Miss. 2009)) (emphasis added); *see also* ***Randall v. State***, 806 So. 2d 185, 231–32 (Miss. 2001) ("Rules 101 and 1101(b)(3) state that the Rules of Evidence do not apply to sentencing hearings."). Further, we also have stated:

> In the sentencing phase of a capital murder trial, the stakes are life and death. *A defendant is permitted to introduce virtually any relevant and reliable evidence touching upon the defendant's background and character, or the crime itself, which is offered as a basis to persuade a jury to return a sentence of less than death*. We caution prosecutors and trial judges about limiting mitigation evidence offered by a defendant when it is presented fairly, and is relevant to the defendant's character, background, or the circumstances surrounding the crime.

***Fulgham v. State***, 46 So. 3d 315, 336 (Miss. 2010) (emphasis added).

¶111. The trial judge erred by not allowing Katherine to testify that Hutto had told her that he was sexually abused as a child. Such testimony would be relevant evidence "touching upon the defendant's background and character." *See* ***Fulgham***, 46 So. 3d at 336. But Katherine's testimony would have been cumulative of other testimony given during

mitigation. Dr. Julie Schroeder, an expert witness for Hutto, testified during mitigation that Hutto had told her that he was sexually abused as a child. Dr. Schroeder also testified, in great detail, as to the lasting effects that such abuse would have on a child. Therefore, we find the trial judge's error to be harmless beyond a reasonable doubt.[16] *See **Byrom***, 863 So. 2d at 858.

**Dr. Schroeder**

¶112. Hutto also argues that the trial judge excluded other relevant mitigation testimony from Dr. Schroeder. During mitigation, the defense tendered Schroeder, who has a Ph.D. in social work, "as an expert in social work, particularly in the area of human development." Because Hutto's counsel did not timely alert the State about this witness, the trial judge conducted a proffer of Schroeder's testimony to allow the State to prepare for cross-examination.

¶113. Before the proffer, the trial judge stated:

> BY THE COURT: . . . There's not going to be any crossover [between social work and psychiatry and psychology] in her testimony. She's strictly being offered and tendered in the field of social work and its impact that it may have on an individual's conduct as the result of social, environmental backgrounds in this individual's life; is that correct?

---

[16]Hutto argues Katherine's testimony was not cumulative of other testimony heard in mitigation. He argues that Katherine was the only witness who could testify that Hutto had made these statements before his arrest; thus, he argues her testimony was the only evidence to show he was not asserting an "abuse excuse." We find Hutto's temporal argument unpersuasive. Regardless of when Hutto claimed he was abused, the jury heard testimony during mitigation that Hutto was sexually abused as a child.

BY THE DEFENSE: That is correct.

The trial judge accepted Schroeder as an expert in "social work, human development and behavior." During the proffer, Schroeder testified that, although Hutto never had been diagnosed with post-traumatic stress disorder, she "observed" that Hutto suffered from PTSD. Schroeder also testified that, in order to "deal with the PTSD," Hutto needed a course of treatment, including psychoeducation and therapy.

¶114. After the proffer, the trial judge again stated that Schroeder could not testify to the jury about a psychological diagnosis or treatment plan, finding these opinions beyond the field of expertise for which she had been offered. Consistent with this ruling, the trial judge allowed Schroeder to testify about the effects of traumatic events Hutto experienced as a child but did not allow Schroeder to offer a medical or psychological diagnosis or treatment plan for Hutto. Hutto argues that Schroeder was qualified to offer such opinions.

¶115. We review a trial judge's exclusion of expert testimony for abuse of discretion. *Gillett v. State*, 56 So. 3d 469, 494 (Miss. 2010). Our rules of evidence and caselaw require that an expert be qualified to offer an opinion in a particular area and that his or her testimony also be relevant and reliable. *See* M.R.E 702; *see also* *Gillett*, 56 So. 3d at 495; *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31 (Miss. 2003). Indeed, "*only* if the witness possesses scientific, technical, or specialized knowledge *on a particular topic* will he [or she] qualify as an expert *on that topic*." *Bailey Lumber & Supply Co. v. Robinson*, 98 So. 3d 986, 992

(Miss. 2012) (emphasis added) (quoting *Worthy v. McNair*, 37 So. 3d 609, 616 (Miss. 2010)).

¶116. In support of his argument that Schroeder was qualified to offer these opinions, Hutto cites *Fulgham*. In *Fulgham*, the defendant called four mitigation witnesses. *Fulgham*, 46 So. 3d at 334. Mark Webb, *a psychiatrist*, testified that the defendant suffered from PTSD and a panic disorder. *Id.* (emphasis added). The defense also offered Adrienne Dorsey-Kidd, a social worker, "in the area of social work . . . not psychiatry or psychology." *Id.* at 335. Dorsey-Kidd attempted to testify to four observations she had made: "(1) lack of parental bonding; (2) substance abuse by Carol Morgan and at least two of Fulgham's stepfathers; (3) lack of a biological father's input; and (4) the love that Fulgham had for her children and vice versa after three years of incarceration." *Id.* The State argued that Dorsey-Kidd's testimony was hearsay, and the trial judge sustained the objection. *Id.* On appeal, we concluded the trial judge had abused his discretion because "the State presented no argument or evidence that Dorsey-Kidd's testimony was outside the field of social work." *Id.*

¶117. The case at hand is easily distinguishable from *Fulgham*. In *Fulgham*, a psychiatrist–not a social worker–testified that the defendant suffered from PTSD. Further, the testimony withheld in *Fulgham* is similar to the testimony that the trial judge allowed the jury to hear from Schroeder. Schroeder testified about the traumatic events Hutto had experienced as a child, including physical and sexual abuse, living with a stepfather who abused alcohol, and living with a mother who suffered from bipolar disorder and had

53

attempted suicide multiple times. She testified that people who suffered the type of abuse Hutto experienced "don't learn how to self-soothe or cope," "don't learn anything about positive relationships," and "receive mixed messages" as a child.

¶118.  Hutto also cites *Pickett v. State*, 143 So. 3d 596 (Miss. Ct. App. 2013). In *Pickett*, a sexual-battery case, a *licensed clinical social worker* diagnosed the defendant's stepdaughter with PTSD after the defendant sexually abused her. *Pickett*, 143 So. 3d at 599. On appeal, the defendant argued that the trial court had erred in accepting the social worker as an expert under Mississippi Rule of Evidence 702. *Id*. at 603. Specifically, the defendant argued that the social worker's "methodology for arriving at her opinion [could not] be tested for reliability and [was] based entirely upon . . . subjective belief." *Id.* The Court of Appeals found the trial judge did not abuse his discretion, relying on precedent that held that the *testability* *Daubert* [17]factor did not apply when an expert's opinion was based on forensic interviewing. *Id*. (citing *Carter v. State*, 996 So. 2d 112 (Miss. Ct. App. 2008)).

¶119.  We also find *Pickett* distinguishable. The social worker in *Pickett* was a licensed clinical social worker; the record does not indicate that Dr. Schroeder is a licensed clinician. *See Pickett*, 143 So. 3d at 599. We agree with the State that the defense put on no proof that one who holds a Ph.D. in social work, and who apparently is not a clinician, is qualified to make a PTSD diagnosis. And before the proffer, the trial judge explicitly told defense

---

[17]*Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

54

counsel that there would be no crossover of between social work, psychiatry, and psychology in Dr. Schroeder's testimony. The trial judge did not abuse his discretion in restricting Schroeder's testimony.

¶120. Presiding Justice Dickinson's opinion, dissenting in part, takes the position that the State failed to show that Dr. Schroeder was not qualified to give a PTSD diagnosis. This position, however, skips over the fact that the defense did not show that Dr. Schroeder was qualified to make such a diagnosis. Importantly, Dr. Schroeder did not testify that social workers are qualified to give a PTSD diagnosis. As Presiding Justice Dickinson points out, Dr. Schroeder testified only that social workers "can diagnose or, you know, *have a – present a presenting diagnosis*." Dickinson opinion at ¶ 137.[18]

¶121. Further, Presiding Justice Dickinson fails to acknowledge another key difference between this case and *Fulgham*. In *Fulgham*, the defendant "timely gave notice to the State of her expert witness and offered Dorsey–Kidd's proposed testimony via an expert report." *Fulgham*, 46 So. 3d at 334. Here, the defense did not timely notify the State about Dr. Schroeder nor did it provide the State with an expert report. Indeed, the trial judge noted

> . . . I want to be fair to both parties, but the main person I've got to be fair to is Mr. Hutto. And that's the only reason why this lady is on the stand right now giving any information. If this was any other civil matter or any other matter pertaining to something that was not a capital case with the death penalty at stake, I would have excluded this lady's testimony because of it not being

---

[18]We assume that the term "presenting diagnosis" means a diagnosis made based on presenting symptoms. We note, however, that Dr. Schroeder never testified as to what a presenting diagnosis is, and a clear definition is not easily ascertainable by this Court.

55

timely divulged, along with the proper information made available to counsel opposite for their review.

Thus, the claim that the State should have presented expert testimony or cited professional literature in rebuttal fails to recognize that the State had no idea of the content of what Dr. Schroeder's testimony. Simply put, the defense sandbagged the State with her testimony. Again, "[w]e caution prosecutors and trial judges about limiting mitigation evidence offered by a defendant when it is *presented fairly* . . . ." **Fulgham**, 46 So. 3d at 336 (emphasis added). Here, Dr. Schroeder's testimony was not presented fairly, nor was it reliable.

¶122. In conclusion, we must reiterate that death-penalty sentencing phases are unique because defendants may "introduce *virtually any relevant and reliable evidence* touching the defendant's background . . . ." **Id**. We applaud the trial judge for doing so here by allowing Dr. Schroeder to testify in mitigation, to the extent that she was qualified to do so, even though her testimony was not timely divulged.

## XII. Whether the trial judge erred in allowing the jury to consider the underlying felony as an aggravating circumstance in sentencing.

¶123. Hutto's next assignment of error claims that the trial judge erred as a matter of law in allowing the jury to consider the underlying felony of robbery as an aggravator. From the outset, Hutto acknowledges that this Court has held to the contrary but asks this Court to revisit its precedent. Hutto argues that "permitting the jury to use the duplicative aggravator as a sentencing aggravator" does not comport with the United States Supreme Court

decisions in ***Ring v. Arizona***, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), and

***Apprendi v. New Jersey***, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

¶124. "This Court has held that the alleged felony underlying the capital-murder conviction

may properly be used as an aggravator." ***Gillett v. State***, 56 So. 3d 469, 510 (Miss. 2010).

Further, this Court has rejected the contention that ***Ring*** and ***Apprendi*** prohibit the

submission of this aggravator. In ***Gillett***, this Court reiterated:

> Relying primarily on ***Ring*** and ***Apprendi***, [the defendant] maintains that the use of the underlying felony of armed robbery as an aggravating circumstance upon which the jury relied in returning a sentence was improper. However, evidence of the underlying crime can properly be used both to elevate the crime to capital murder and as an aggravating circumstance. *See* ***Bennett*** [***v. State***], 933 So. 2d [930,954 (Miss. 2006)] ; ***Goodin v. State***, 787 So. 2d 639, 654 (Miss. 2001); ***Smith*** [***v. State***], 729 So. 2d [1191,1223 (Miss. 1998)]; ***Bell v. State***, 725 So. 2d 836, 859 (Miss. 1998); ***Crawford v. State***, 716 So. 2d 1028, 1049-50 (Miss. 1998). Furthermore, the United States Supreme Court has held that there is no constitutional error in using the underlying felony as the aggravator. ***Lowenfield v. Phelps***, 484 U.S. 231, 233, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988). The Supreme Court stated in ***Tuilaepa v. California***, 512 U.S. 967, 972, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994), that "[t]he aggravating circumstances may be contained in the definition of the crime or in a separate sentencing factor (or in both)."

> The use of the underlying felony as an aggravator was not error.

***Gillett***, 56 So. 3d at 510 (quoting ***Ross***, 954 So. 2d at 1014 (Miss. 2007)). As we already have

rejected the argument advanced here, we find no merit in Hutto's twelfth assignment of error.

**XIII.   Whether Hutto's death sentence is constitutionally and statutorily disproportionate.**

¶125. Hutto claims the death penalty in his case is constitutionally and statutorily

disproportionate. Hutto reasserts several arguments averring that Simpson may have died

57

quickly, that Hutto suffers from PTSD due to childhood sexual abuse, and that Hutto's erratic behavior prejudiced the jury against him.

¶126. In reviewing a death sentence, this Court conducts its own review to determine:

(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

(b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;

(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and

(d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

Miss. Code Ann. § 99-19-105(3) (Rev. 2015).

¶127. First, after reviewing the record, we cannot conclude that the jury sentenced Hutto to death out of passion, prejudice, or some other arbitrary factor.

¶128. Second, for the reasons set forth in Issues IX, X, and XII above, we find sufficient evidence supported the jury's finding of the "prior violent felony," the "heinous, atrocious, or cruel," and the "in the commission of a robbery" aggravating circumstances.

¶129. Third, in comparing other similar cases to the case at hand, we find the sentence of death is neither excessive nor disproportionate. "The Court has upheld the death penalty for capital murders committed during the commission of a robbery." *Dickerson*, 175 So. 3d at 35; *see also* *Gillett*, 56 So. 3d at 524; *Flowers v. State*, 158 So. 3d 1009, 1075 (Miss. 2014*)*

58

*cert. granted, judgment vacated by* **Flowers v. Miss**., 136 S. Ct. 2157, 195 L. Ed. 2d 817 (2016)); **Chamberlin v. State**, 989 So. 2d 320, 345 (Miss. 2008). Further, this Court also has determined a death sentence is appropriate where the victim's death was heinous, atrocious, or cruel. *See* **Batiste v. State**, 121 So. 3d 808, 870-873 (Miss. 2013). Hutto's death sentence is neither excessive nor disproportionate.

¶130.  Fourth, for the reasons set forth in Issues IX, X, and XII above, we already have addressed Section 99-19-105(3)(d).

**XIV.   Whether the cumulative effect of error mandates reversal of the verdict of guilt and/or sentence of death.**

¶131.  This Court adheres to the cumulative-error doctrine. *See* **Dickerson**, 175 So. 3d at 35. Under this doctrine, "although no error, standing alone, requires reversal, the aggregate effect of various errors may create such an atmosphere of bias, passion[,] and prejudice that they effectively deny the defendant a fundamentally fair trial." **Flowers**, 158 So. 3d at 1075 (quoting **Goff**, 14 So. 3d at 672).

¶132.  We find that all errors in this trial were harmless beyond a reasonable doubt or did not result in prejudice mandating reversal. "A criminal is not entitled to a perfect trial, only a fair trial." **Ronk**, 172 So. 3d at 1148 (quoting **McGilberry v. State**, 741 So. 2d 894, 924 (Miss. 1999)). We find that Hutto received a fair trial and that no reversible error occurred.

**CONCLUSION**

¶133.  For the foregoing reasons, we affirm Hutto's conviction and sentence.

¶134. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH, AFFIRMED.**

**WALLER, C.J., RANDOLPH, P.J., MAXWELL AND BEAM, JJ., CONCUR. DICKINSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, KING AND COLEMAN, JJ.**

**DICKINSON, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

> In the sentencing phase of a capital murder trial, the stakes are life and death. A defendant is permitted to introduce virtually any relevant and reliable evidence touching upon the defendant's background and character, or the crime itself, which is offered as a basis to persuade a jury to return a sentence of less than death.[19]

¶135. With the above principle in mind, this Court has stated: "We caution prosecutors and trial judges about limiting mitigation evidence offered by a defendant when it is presented fairly, and is relevant to the defendant's character, background, or the circumstances surrounding the crime."[20]

¶136. This backdrop exposes clear error in the circuit judge's decision to limit Dr. Julie Schroeder's expert testimony in the sentencing phase of this capital-murder trial. The circuit judge ruled Dr. Schroeder lacked the expertise to offer any diagnosis, even though her undisputed testimony clearly and unambiguously established that experts in her field possess that very expertise, and even though the State failed to offer a scrap of evidence or authority

---

[19] ***Fulgham v. State***, 46 So. 3d 315, 336 (Miss. 2010).

[20] ***Id.***

60

to rebut her testimony. It is true that we review a circuit judge's decision to exclude evidence for an abuse of discretion,[21] but it also is true that arbitrary rulings amount to an abuse of discretion.[22] And a decision unsupported by any evidence is by definition arbitrary.[23]

¶137. Dr. Schroeder—who possesses a bachelor's degree in psychology, a master's degree in social work, and a Ph.D. in social work—testified that, as a professor of social work at Jackson State University, she teaches "psychopathology and differential diagnosis, which is trying to determine – rule out specific diagnoses and rule in other diagnoses." When asked to detail the differences between a social worker and a psychologist, Dr. Schroeder explained that social workers "do assessments and report writing about individuals" and "can diagnose or, you know, have a – present a presenting diagnosis." Dr. Schroeder also explained that an Axis I mental-health diagnosis "is not necessarily a medical diagnosis." So, when Hutto

---

[21] *Id.* at 334 (citing *Bishop v. State*, 982 So. 2d 371, 380 (Miss. 2008)).

[22] *Gillett v. State*, 56 So. 3d 469, 494 (Miss. 2010) (citing *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31 (Miss. 2003)).

[23] *Overton v. State*, 195 So. 3d 715, 719 (Miss. 2016) ("Again, the trial judge never held that the witnesses were excluded because of a willful violation. But if, as the dissent believes, he did, then we would be required to examine the record to find evidence to support that finding. We find none, so any such finding would have been arbitrary and without support."); *Miss. State Dep't of Health v. Natchez Cmty. Hosp.*, 743 So. 2d 973, 977 (Miss. 1999) ("If an administrative agency's decision is not based on substantial evidence, it necessarily follows that the decision is arbitrary and capricious.").

61

proffered Dr. Schroeder's opinion that he suffered from post traumatic stress disorder, that testimony fell squarely within Dr. Schroeder's expertise.

¶138. The State made no attempt to rebut this testimony in any way. It presented no expert testimony suggesting that Dr. Schroeder, or social workers in general, lack the expertise to diagnose PTSD. Nor did the State cite any professional literature to that effect. In fact, it was the circuit judge—not the State—who first suggested Dr. Schroeder could not make a diagnosis, and the circuit judge did so based on nothing discernable in the record.

¶139. The circuit judge in *Fulgham v. State* made exactly the same error as the judge here.[24] There, the State objected to a social worker's testimony, arguing she was "'not authorized to give any opinions in the areas set forth in her report. She is a social worker, she is not a psychiatrist or a psychologist.'"[25] The circuit judge sustained the objection, but this Court reversed.[26] We found the circuit judge's ruling erroneous because "[i]n objecting to Dorsey-Kidd's testimony, the State presented no argument or evidence that Dorsey-Kidd's testimony was outside the field of social work."[27]

---

[24] *Fulgham*, 46 So. 3d at 335.

[25] *Id.*

[26] *Id.* at 335–37.

[27] *Id.* at 335.

¶140. The majority tries to distinguish *Fulgham*, stating "[i]n *Fulgham*, a psychiatrist–not a social worker–testified that the defendant suffered from PTSD."[28] This completely misses *Fulgham*'s import.

¶141. If *Fulgham* stands for anything, it stands as precedent that a circuit judge may not arbitrarily limit an expert witness's testimony. When an expert states under oath that a particular thing falls within his or her field of expertise, *something* must support the circuit judge's conclusions to the contrary. Here, nothing does. So I believe the circuit judge here—as did the circuit judge in *Fulgham*—abused his discretion when he prohibited Dr. Schroeder from testifying that she had diagnosed Hutto with PTSD.

¶142. In *Fulgham*, we reversed Fulgham's death sentence because "we [were] unable to say that such an error did not affect the jury's ultimate decision."[29] We have recognized that mental-health evidence constitutes a critical component of a capital-murder defense.[30]

¶143. Dr. Schroeder would have testified that:

> A.     . . . I believe he does have an anxiety disorder which is where the post-traumatic stress fits in there. And that has impacted the way his personality has developed over time, the way he copes with things, the impulsivity, the erratic behavior. Because when you grow up in an

---

[28] Maj. Op. at ¶117.

[29] *Fulgham*, 46 So. 3d at 336.

[30] *State v. Tokman*, 564 So. 2d 1339, 1343 (Miss. 1990) (citing *Ake v. Oklahoma*, 470 U.S. 68, 80, 105 S. Ct. 1087, 1094, 84 L. Ed. 2d 53 (1985)).

63

environment where you're facing all of those types of abuse, you don't learn how to self-soothe and deal with things on your own, so you tend to -- as you get older, you don't know what to do with those things so you become volatile and aggressive to solve problems.

Q.     And this -- you mentioned PTSD, post-traumatic stress disorder.

A.     Uh-huh (affirmative response).

Q.     That is what you observed?

A.     Yes.

¶144. This testimony would have informed the sentencing jury that Hutto had been diagnosed with a condition affecting his impulse control, explaining his violent propensity, and tying his criminal conduct to his traumatic life experiences.  The circuit judge prevented the jury from hearing that explanation.  What is more, the prosecutor—who did not even raise the issue with the trial judge—nevertheless seized on the circuit judge's gratuitous ruling, making a point in its sentencing-phase closing argument to direct the jury's attention to Dr. Schroeder's failure to provide a diagnosis or explanation of the connection between Hutto's violence and his background:

> Then we've got Dr. Schroeder, and I don't even know where to begin with that. She's not a psychiatrist, she's not a psychologist, she's not medical doctor. She has a Ph.D. in social work. There's no diagnosis in regards to James Hutto.
>
> . . .
>
> And Dr. Schroeder harped on these allegations that James Hutto had been abused or molested as a child. And I want to clarify to you that those are those are allegations. We don't know that those things happened. If they did happen, it's not okay, and the people that did it should be held accountable. However,

what I propose to you is that victims of molestation, they may lose their innocence, sure. They don't lose their concept of right or wrong. They don't lose their concept of morality. They don't lose their conscience.

James Hutto knows the difference between right or wrong, and he knew it in September of 2010 when he murdered Ethel Simpson. What I'm struggling with – what I'm struggling with what Dr. Schroeder says is what's the nexus between abuse as a child, if it happened, and getting the rage to kill an elderly woman that you just met? What's the nexus? There is no nexus, because how do you explain the dozens of successful men who were abused as children? How do you compromise that? That nexus has not been made for you and that is not mitigation.

¶145. Given that the State thought Dr. Schroeder's failure to provide a diagnosis constituted a serious flaw in Hutto's mitigation, I am "unable to say that such an error did not affect the jury's ultimate decision."[31] So I would reverse Hutto's death sentence and remand for a new and fair sentencing hearing.

**KITCHENS, KING AND COLEMAN, JJ., JOIN THIS OPINION**.

---

[31] *Fulgham*, 46 So. 3d at 336.

# APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*David Cox v. State*,183 So. 3d 36 (Miss. 2015).

*David Dickerson v. State*, 175 So. 3d 8 (Miss. 2015).

*Timothy Robert Ronk v. State*, 172 So. 3d 1112 (Miss. 2015).

*Curtis Giovanni Flowers v. State*, 158 So. 3d 1009 (Miss. 2014). *following remand.

*Caleb Corrothers v. State*, 148 So. 3d 278 (Miss.  2014).

*Jason Lee Keller v*. *State*, 138 So. 3d 817 (Miss. 2014).

*Leslie Galloway III v. State*, 122 So. 3d 614 (Miss. 2013).

*Bobby Batiste v. State*, 121 So 3d 808 (Miss. 2013), *granted leave to seek PCR* (Jan. 21, 2016).

*Roger Lee Gillett v. State,* 56 So. 3d 469 (Miss. 2010).

*Moffett v. State*, 49 So. 3d 1073 (Miss. 2010).

*Pitchford v. State*, 45 So. 3d 216 (Miss. 2010).

*Goff v. State*, 14 So. 3d 625 (Miss. 2009).

*Wilson v. State*, 21 So. 3d 572 (Miss. 2009).

*Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008).

*Loden v. State*, 971 So. 2d 548 (Miss. 2007).

*King v. State,* 960 So. 2d 413 (Miss. 2007).

*Bennett v. State*, 933 So. 2d 930 (Miss. 2006).

*Havard v. State*, 928 So. 2d 771 (Miss. 2006).

*Spicer v. State*, 921 So. 2d 292 (Miss. 2006).

*Hodges v. State*, 912 So. 2d 730 (Miss. 2005).

*Walker v. State*, 913 So. 2d 198 (Miss. 2005).

*Le v. State*, 913 So. 2d 913 (Miss. 2005), *granted leave to seek second PCR*,  2013-DR-00327-SCT (Feb. 23, 2016).

*Brown v. State*, 890 So. 2d 901 (Miss. 2004).

*Powers v. State*, 883 So. 2d 20 (Miss. 2004)

*Branch v. State*, 882 So. 2d 36 (Miss. 2004).

*Scott v. State*, 878 So. 2d 933 (Miss. 2004).

*Lynch v. State*, 877 So. 2d 1254 (Miss. 2004).

*Dycus v. State*, 875 So. 2d 140 (Miss. 2004).

*Byrom v. State*, 863 So. 2d 836 (Miss. 2003).

*Howell v. State*, 860 So. 2d 704 (Miss. 2003).

*Howard v. State*, 853 So. 2d 781 (Miss. 2003).

*Walker v. State*, 815 So. 2d 1209 (Miss. 2002). *following remand.

*Bishop v. State*, 812 So. 2d 934 (Miss. 2002).

*Stevens v. State*, 806 So. 2d 1031 (Miss. 2002).

*Grayson v. State*, 806 So. 2d 241 (Miss. 2002).

*Knox v. State*, 805 So. 2d 527 (Miss. 2002).

*Simmons v. State*, 805 So. 2d 452 (Miss. 2002).

*Berry v. State*, 802 So. 2d 1033 (Miss. 2001).

*Snow v. State*,  800 So. 2d 472 (Miss. 2001).

*Mitchell v. State*, 792 So. 2d 192 (Miss. 2001).

*Puckett v. State*, 788 So. 2d 752 (Miss. 2001). * following remand.

*Goodin v. State*,  787 So. 2d 639 (Miss. 2001).

*Jordan v. State*, 786 So. 2d 987 (Miss. 2001).

*Manning v. State*, 765 So. 2d 516 (Miss. 2000). *following remand.

*Eskridge v. State*, 765 So. 2d 508 (Miss. 2000).

*McGilberry v. State*, 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State*, 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State*, 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State*, 735 So. 2d 238 (Miss. 1999).

*Turner v. State*, 732 So. 2d 937 (Miss. 1999).

*Smith v. State*, 729 So. 2d 1191 (Miss. 1998).

*Burns v. State*, 729 So. 2d 203 (Miss. 1998).

*Jordan v. State*, 728 So. 2d 1088 (Miss. 1998).

*Gray v. State*, 728 So. 2d 36 (Miss. 1998).

*Manning v. State*, 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State*, 726 So. 2d 524 (Miss. 1997).

*Bell v. State*, 725 So. 2d 836 (Miss. 1998), *post-conviction relief granted in part and denied in part*, 725 So. 2d 836 (Miss. 2011).

*Evans v. State*, 725 So. 2d 613 (Miss. 1997).

*Brewer v. State*, 725 So. 2d 106 (Miss. 1998).

*Crawford v. State*, 716 So. 2d 1028 (Miss. 1998).

*Doss v. State*, 709 So. 2d 369 (Miss. 1996).

*Underwood v. State*, 708 So. 2d 18 (Miss. 1998).

*Holland v. State*, 705 So. 2d 307 (Miss. 1997).

*Wells v. State*, 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State*, 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State*, 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State*, 684 So. 2d 1179 (Miss. 1996).

*Davis v. State*, 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581 (Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*****Shell v. State**, 554 So. 2d 887 (Miss. 1989); **Shell v. Mississippi,** 498 U.S. 1 (1990) reversing, in part, and remanding; **Shell v. State**, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*****Pinkney v. State**, 538 So. 2d 329 (Miss. 1989); **Pinkney v. Mississippi**, 494 U.S. 1075 (1990) vacating and remanding; **Pinkney v. State**, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*****Clemons v. State**, 535 So. 2d 1354 (Miss. 1988); **Clemons v. Mississippi**, 494 U.S. 738 (1990) vacating and remanding; **Clemons v. State**, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987); *Jones v. Mississippi*, 487 U.S. 1230 (1988) vacating and remanding; *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So.  2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

*Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCING PHASE

*Erik Wayne Hollie v. State*, 174 So. 3d 824 (Miss. 2015).

*Manning v. State*, 158 So. 3d 302 (Miss. 2015) (reversing denial of post-conviction relief).

*Byrom v. State*, 2014-DR-00230-SCT (April 3, 2014) (order).

*Ross v. State*, 954 So. 2d 968 (Miss. 2007).

*Flowers v. State*, 947 So. 2d 910 (Miss. 2006).

*Flowers v. State*, 842 So. 2d 531 (Miss. 2003).

*Randall v. State*, 806 So. 2d 185 (Miss. 2002).

*Flowers v. State*, 773 So. 2d 309 (Miss. 2000).

*Edwards v. State*, 737 So. 2d 275 (Miss. 1999).

*Smith v. State*, 733 So. 2d 793 (Miss. 1999).

*Porter v. State*, 732 So. 2d 899 (Miss. 1999).

*Kolberg v. State*, 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State*, 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State*, 702 So. 2d 388 (Miss. 1997).

*Howard v. State*, 701 So. 2d 274 (Miss. 1997).

*Lester v. State*, 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State*, 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*,  531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

# DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## FOR RESENTENCING TO LIFE IMPRISONMENT

*Bell v. State*, 160 So. 3d 188 (Miss. 2016).

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# <u>ON SENTENCING PHASE ONLY</u>

*Fulgham v. State*, 46 So. 3d 315 (Miss. 2010).

*Rubenstein v. State*, 941 So. 2d 735 (Miss. 2006).

*King v. State*,  784 So. 2d 884 (Miss. 2001).

*Walker v. State*, 740 So. 2d 873 (Miss. 1999).

*Watts v. State*, 733 So. 2d 214 (Miss. 1999).

*West v. State*, 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State*, 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989); *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding; *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989); *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding; *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988); *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding; *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987); *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding; *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986); *cert. denied, Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed.

*Williams v. State*, 445 So. 2d 798 (Miss. 1984). *Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.